THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES MICHAEL ASHLEY, Defendant-Appellant.

Fifth District   No. 5—87—0705

Opinion filed January 2, 1991.

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Jon Anderson, State's Attorney, of Robinson (Kenneth R. Boyle, Stephen E. Norris, and Raymond F. Buckley, Jr., all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Charles Michael Ashley, was found guilty of six counts of murder. One count charged violation of section 9—1(a)(1) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), three counts charged violation of section 9—1(a)(2) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—

1(a)(2)), and two counts charged violation of section 9—1(a)(3) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)). Defendant was also convicted of aggravated arson in violation of section 20—1.1 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1). The State originally sought the death penalty, but later waived that sentencing option. Defendant was sentenced to natural life imprisonment on three counts of murder, and to an extended term of 50 years on the aggravated arson. In this cause, defendant raises the following issues: (1) whether defendant was denied his equal protection and sixth amendment rights by the State's use of nine peremptory challenges to exclude women from the petit jury; (2) whether defendant was denied a fair trial because he was not allowed to present proposed evidence in his defense; (3) whether defendant was denied a fair trial where the State's rebuttal witness was permitted to testify and defense counsel was not given an opportunity to interview that witness first; (4) whether defendant's conviction for aggravated arson should be reversed due to its being based upon the same physical act as felony murder; (5) whether defendant was denied a fair trial due to statements made by the prosecuting attorney in closing arguments; and (6) whether the trial court erred in sentencing defendant to an extended term. This court affirms in part and vacates in part.

On February 1, 1987, at approximately 5:30 a.m., a fire at 1207 S. King in Robinson was observed by a passerby, Carl Jones. Jones attempted to flag down a blue and white Ford Bronco that was in the area in order to obtain assistance. The Bronco did not stop. Jones then went to a nearby house and awakened its occupant, and a call to the fire department was made.

Two Robinson volunteer firemen testified that when they arrived on the scene, they saw smoke and fire coming from the south end of the house. The fire had progressed to a point where the house was full of smoke and there was almost no visibility. The firefighters used hoses throughout the house to fight the fire. Two children, later identified as Jennifer Buchanan, age two, and Rachael Buchanan, age four, were found in the house. It was determined that both died of smoke inhalation and carbon monoxide poisoning. No trauma was found on either child's body. The body of a woman, later identified as Melinda Buchanan, age 24, was found in the master bedroom. She was wearing a tank top and a pair of bikini underwear pulled below her buttocks. A large amount of burnt ceiling debris was found both around and on top of her and blood was found on the floor beneath her head. Samples of Melinda Bu-

chanan's head and pubic hair were taken, as well as clippings from underneath her fingernails, and mouth, vaginal, and rectal swabs.

A black jacket was found on the floor of the master bedroom near Melinda Buchanan's body. A photograph of Bill and Pattie Murphy was found inside the jacket, along with a cigarette lighter, cigarette papers, and two ink pen caps. A wooden flower stand was located just outside the master bedroom and a flower pot was found underneath the bed. Expert testimony indicated the fire in the house was not caused by natural or accidental means. It was determined that three separate fires had been set in the house, one in the master bedroom, one in a closet near the children's bedroom, and one in the bathroom. According to expert testimony, the fires had been started at least 45 to 60 minutes before the firefighters arrived.

Glenn Schubert, an expert in hair and fiber comparison, testified that three pubic hairs consistent with samples from defendant, but inconsistent with samples from Melinda or her husband, Benjamin Buchanan, had been found on Melinda's panties. Additionally, two pubic hair samples consistent with samples from defendant, but dissimilar to samples from Melinda or Ben Buchanan, were taken from a pair of blue jeans, a sweater, and a sock found in the master bedroom. Also found in this debris was one pubic hair consistent with Melinda Buchanan's standard, but dissimilar to defendant's or Ben Buchanan's standard, and one head-hair fragment consistent with the head-hair standard of Melinda Buchanan, but dissimilar to the head-hair standards of defendant, Rachael or Jennifer Buchanan. One head-hair fragment consistent with the standard of Rachael Buchanan, but dissimilar with the other standards, was also found.

Defendant's car was taken by the State on February 9, 1987, and returned on February 11, 1987. A T-shirt with a "U.S.S. Saratoga" logo and a bandanna were found under the driver's seat. Four fragments of head hairs were found on the T-shirt, which were consistent with Melinda Buchanan's head-hair standard. One head hair of unknown origin was also found. Scrapings from Melinda's fingernails revealed several fibers dissimilar to clothing worn by defendant on the morning in question. Finally, moss-like botanical material with similar characteristics were found on Melinda's underwear, under her fingernails, on defendant's jacket, which was found in the Buchanan master bedroom, and on the T-shirt and bandanna found in defendant's car.

Dr. Barbara Crandall-Stotler, an expert in botany with a spe-

cialty in mosses, examined the packets of debris received from Glenn Schubert, the hair and fiber expert. The debris came from the jeans, sweater, and sock found near Melinda's body, defendant's jacket found in the master bedroom, Melinda's fingernail scrapings and her tank top, and the T-shirt and bandanna found in defendant's car. All items had sphagnum moss, which is commonly found in commercial potting soil. Dr. Crandall-Stotler concluded that the peat moss in all samples had come from the same species and all were at the same level of decomposition.

Ilya Zeldes, defendant's expert in forensic science, found both similarities and dissimilarities in the hair samples examined by Glenn Schubert. Zeldes was unable to reach a definite opinion about the source of the hairs. He used a compound microscope for his examinations while the State's expert used a comparison microscope. A preliminary report by the Committee on Forensic Hair Comparison, a division of the FBI, indicated that a comparison microscope is mandatory when performing hair analysis. Zeldes did not accept this conclusion.

A pathologist performed autopsies on the three victims. As to Melinda Buchanan, an external examination showed that her underpants were pulled down over her hips at the time of death. External injuries were found on her face and neck, the most severe being a fractured jaw. The pathologist believed this was caused by someone stomping on her face. There were no signs of injury to her vagina, and no sperm was present. However, there was testimony that if sperm had been present, it could have been destroyed by the heat of the fire. The pathologist concluded that Melinda Buchanan died of strangulation and that she had not been breathing when the fire was set.

Benjamin Buchanan, Melinda's husband, and the father of Rachael and Jennifer Buchanan, testified that on January 26, 1987, he left Robinson and moved to Chula Vista, California, to begin a new job as an embalmer. He was staying with his identical twin brother, Bruce, and Bruce's wife, Barbara, until he found a place for his own family. His wife and two children were expected to join him. On the night of January 31, 1987, Ben went to Tijuana, Mexico, with a friend. They returned to Chula Vista between 2:30 a.m. and 3 a.m. on February 1, 1987. Ben's mother called from Robinson, Illinois, on the morning of February 1, to inform Ben that his wife and daughters had been killed. Ben, Bruce, and Barbara flew back to Robinson that afternoon. Telephone records confirming the call were introduced, as were airline records confirming the Buchanans' flights.

Ben testified that he and defendant were friends since their freshman year in high school. During their high school years, the two were close, but had since drifted apart. Ben saw defendant on either Saturday, January 24, or Sunday, January 25, 1987, at Ben's residence in Robinson. Ben told defendant he was going to Chula Vista to obtain employment, but that his family would not be joining him immediately, but would remain in Robinson.

Ben stated that he and Melinda had marital problems approximately three years earlier, but they did not separate. The two had since worked out their differences and were enjoying a good relationship when he left for Chula Vista. Ben also testified that he had no life insurance on his wife or his daughters.

The State presented evidence as to defendant's activities on the night of January 31 and morning of February 1, 1987. Pattie and Bill Murphy, husband and wife, and Stephen Ashley, defendant's brother, testified that about 7 or 7:30 p.m. on January 31, 1987, the Ashley brothers had gone to the Murphys' apartment. They stayed for approximately one hour and had some alcoholic beverages. During this time, defendant told the Murphys that Ben Buchanan had gone to California and that Melinda was still in Robinson. The four then proceeded to a local tavern named Toots'. Several more alcoholic beverages were consumed by all four members of the group. Pattie Murphy testified that defendant bragged that he could have sex in Robinson because "his old lady" was there. According to Pattie Murphy, defendant was not referring to his wife. Pattie Murphy also testified that earlier in the evening, defendant had offered to hit a woman who had been flirting with her husband. Defendant stated he was not worried about getting arrested for hitting this woman because he was going out of town and did not believe he would be extradited. Stephen Ashley, however, testified that defendant had not made these statements.

At approximately 11:40 p.m., defendant left the tavern for 10 to 15 minutes to go a liquor store to purchase a case of beer. Defendant arrived back at the tavern at approximately 11:55 p.m. Defendant and the other three individuals then went back to the Murphys' apartment, where everyone continued drinking. At approximately 12:30 a.m., all four then went for a drive in the country during which time more alcohol was consumed. The group arrived back at the Murphys' apartment about 1:30 a.m. and continued to drink, talk, and watch television. Pattie Murphy then gave both defendant and his brother a picture of both her and her husband. Defendant put his picture in his coat pocket. The picture was found in the

pocket when his jacket was retrieved from the master bedroom of the Buchanan residence. Bill Murphy took photographs of his wife and the Ashley brothers between 1:30 and 2 a.m. In these photographs, defendant is wearing a white T-shirt with a "U.S.S. Saratoga" logo on it, a black jacket, and a blue bandanna. Defendant, Stephen Ashley, and Bill Murphy also smoked some marijuana. At approximately 2:30 a.m., defendant and his brother got into an argument. Defendant hit his brother and then left the Murphys' apartment. Defendant said he would be back in 15 minutes, but never returned. Pattie Murphy took Stephen Ashley home later in the morning.

When Stephen Ashley returned home to his mother's house between 6:30 and 8:30 a.m., he found defendant asleep on the living room floor. Defendant asked Stephen on February 3 if Stephen had seen his black jacket. Stephen told him it might have been left at the Murphys'.

Defendant and his wife left to return to Fort Hood, Texas, on the afternoon of February 2, 1987. Defendant was arrested by military police on February 4, 1987. DCI agents Mervin Gillenwater and Randall Rue went to Fort Hood, Texas, on February 5, 1987, to question and to arrest defendant. Defendant gave the agents a statement concerning his activities on the evening of January 31 and the morning of February 1, 1987. Defendant's statement was similar to the Murphys' and to his brother's, except he stated that when he left Toots' tavern at approximately 11:30 p.m. to get beer, he stopped by the Buchanan residence to get Ben's telephone number in California. Defendant stated that Melinda was getting her daughters ready for bed when he arrived. She then went to get the phone number, at which time one of the girls spilled water on defendant's T-shirt. Defendant stated that he changed into another shirt and put the wet shirt with his jacket. He also stated that he went to the bathroom while he was there and must have left his black jacket at the Buchanans' house. He told the agents that he was at the Buchanan residence for 5 to 10 minutes.

Defendant did not give a signed statement, nor was a recording made. Agent Gillenwater's notes were destroyed after his report was made.

Stephen Ashley testified that he cleaned his brother's car when his brother arrived back in Robinson on February 6, 1987. Stephen stated that while cleaning the car, he looked under the seat, but no T-shirt or bandanna was there. He also stated that he used defendant's car after defendant was arrested and always locked the doors

when he left the car unoccupied. Stephen Ashley testified that one time he came back to the car and found the doors unlocked.

David Langley, a friend of defendant and defendant's brother, testified that he had been playing pool in Toots' bar the Tuesday or Wednesday before February 1, 1987. On this date, he was at Toots' from 6:30 p.m. until 11:30 p.m. According to Langley, David (Whitey) Hampston, who was not a regular at Toots', came into the bar with two men in three-piece suits. Defendant and his two brothers, Stephen and Buck, were also present at Toots'. The Ashley brothers left Toots' between 9 and 9:30 p.m., and Hampston and his two friends left shortly thereafter. Hampston then returned to Toots' 30 to 45 minutes later. According to Langley, Hampston drove a blue and white Ford Bronco or Chevrolet Blazer.

Also testifying for the defense was Jackie Beard, age 54. He testified that he left his apartment and went down in his front yard at approximately 12:30 a.m. on February 1, 1987, in order to get fresh air to help him breathe better. Beard apparently suffers from a breathing disorder. Approximately 20 minutes later, a man dressed in a T-shirt and dirty blue jeans came jogging up Beard's street. Beard asked him if he would like to have a beer, and the man agreed. The man identified himself to Beard as "Phil." The two went up to Beard's apartment and had a beer. "Phil" stayed at Beard's apartment for approximately 30 minutes and then took 12 sex books of Beard's and left. Beard then testified that "Phil" is actually Bruce Buchanan. Beard admitted that in the past he had been involuntarily committed to the Anna State Mental Hospital by his sisters for seven days. He is currently taking medication for nerves and high blood pressure. Beard stated that he did not come forward with this information until the time of trial because he was afraid of the Buchanans.

Kathleen Ashley, defendant's wife, testified that defendant and his brother, Stephen, had gone out at approximately 7 p.m. on January 31, 1987. Mrs. Ashley, who had been sleeping when defendant arrived home, woke up after defendant arrived. She noticed that it was still dark outside. Mrs. Ashley was unable to see what clothes defendant had on when he arrived home. She testified that he had no cuts or bruises on him the next day. She also testified, as did Stephen and George (Buck) Ashley, that defendant habitually chews his fingernails to the skin.

Mrs. Ashley also testified that she and defendant left Robinson to return to Texas on the afternoon of February 2, 1987. While leaving town, the Buchanans flagged them down. She testified that

Bruce Buchanan seemed upset, but that Ben remained calm. The Ashleys stayed for approximately one-half hour and then drove to Tulsa, Oklahoma. They arrived in Fort Hood, Texas, on the evening of February 4, 1987. Defendant called Bruce Buchanan after their arrival in Fort Hood and spoke calmly for approximately 10 minutes. Mrs. Ashley testified that her marriage to defendant was good.

Defendant testified in his own behalf. At the time of trial, he had been in the Army for five years and seven months. He held the rank of sergeant. Defendant is originally from Robinson, but is stationed in Fort Hood, Texas. Defendant, his wife and daughter arrived in Robinson on January 23, 1987, for defendant's sister's wedding, to be held on January 31, 1987.

Defendant denied making any statements to Pattie Murphy about hitting a woman. He did say that he refers to his wife as his "old lady." His wife confirmed this. Defendant agreed with the Murphys about his activities on the night of January 31, 1987. He testified that he left Toots' bar around 11:35 p.m. to go to the liquor store. However, contrary to his statement to Agent Gillenwater, defendant stated he did not go to the Buchanan house at that time. Defendant testified that he realized he erred in his statement to Agent Gillenwater after hearing the testimony at trial that he had his black jacket at the Murphys' apartment between 2 and 2:30 a.m. After going to the liquor store, defendant returned to Toots' tavern. The Murphys and the Ashleys then went to the Murphys' apartment for approximately 15 to 20 minutes. The group then went riding in the country in defendant's car for what defendant described as "a good while." After arriving back at the Murphys' apartment, defendant got into a fight with his brother, Stephen, and hit him. The argument concerned Stephen's driving defendant's car into a ditch. Defendant then left. He stated that he then drove by the Buchanan residence, where he noticed the kitchen light was on. Defendant stopped to get Bruce Buchanan's telephone number in California. Defendant entered the Buchanan house through the garage entrance. The youngest girl was still awake and was getting a drink of water. Defendant testified that Melinda went to get the phone number, and he remained with the girl. Defendant testified that he knocked the child's water on himself. The water was cold, so defendant went outside to his car to get another shirt. He changed shirts in the bathroom and put the wet "U.S.S. Saratoga" T-shirt and his bandanna into the pockets of his black jacket. He also combed his hair. He stated that he must have then left the

jacket outside the bathroom door. Defendant admitted that he had a lot of alcohol and some marijuana on the night of January 31, 1987, and was "feeling okay" at the Buchanan house. Defendant was unsure of his arrival time to the Buchanans' or his departure time. He did not know what time he got back to his mother's house, where he and his family had been staying while in Robinson. He denied killing Melinda Buchanan or setting the house on fire.

Defendant and his wife left Robinson for Fort Hood, Texas, at approximately 1:30 p.m. on February 2, 1987. Defendant testified the Buchanans flagged them down on their way out of town. Defendant and his wife then talked to the Buchanans for approximately one-half hour before continuing on their journey. Defendant stated that Bruce Buchanan was emotionally upset during this time, but that Ben was calm. After leaving the Buchanans, defendant and his family drove to Tulsa, Oklahoma, arriving at 9:38 p.m. They then visited defendant's brother for two days and arrived in Fort Hood on February 4, 1987. Defendant testified that he cleaned his car two times before his arrest on February 4, 1987. Defendant had cleaned under the driver's seat because his cat had thrown up underneath the seat. Defendant stated that the T-shirt and bandanna were not under the seat at that time.

On rebuttal, Sharon McCale, an employee of the mortuary where Bruce and Ben Buchanan were employed in Chula Vista, California, testified that both Bruce and Ben had been at the mortuary as late as 3 p.m. on January 31, 1987, and then again at 7:45 a.m. on February 1, 1987.

Richard Caudell was recalled by the State and testified that defendant's car was dirty on February 11, 1987, when the T-shirt and bandanna were retrieved.

Kenneth Knight, an expert on hair and fiber analysis, testified that he had checked Glenn Schubert's work in this case. Knight agreed with Schubert's conclusion that certain hairs could have come from defendant. Knight also agreed that a comparison, not a compound, microscope was the proper tool for this analysis.

Defendant's first issue on appeal is whether defendant was denied his equal protection and sixth amendment rights by the State's use of nine peremptory challenges to excuse women from the petit jury.

Defendant argues that the State systematically excluded women from the jury in that the State used nine of its 20 peremptory challenges to exclude women from the jury. Since no gender-neutral reasons were offered for this exclusion, defendant contends that the

State's exclusion of women violated both the sixth amendment and equal protection guarantees of a fair trial. Defendant relies on *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, in which the Supreme Court considered the question of what burden of proof is to be placed on a defendant claiming denial of equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury. The *Batson* Court concluded that a defendant may establish a *prima facie* case of discrimination based solely on evidence concerning the prosecutor's exercise of peremptory challenges at his own trial. The *Batson* Court did not specify the factors and circumstances which would establish a *prima facie* case, but rather, stated that trial judges, experienced in supervising *voir dire,* should consider all relevant facts and circumstances which support or refute the inference of a discriminatory purpose in the State's exercise of peremptory challenges in determining whether a *prima facie* case has been established. Once the trial court determines that a defendant has indicated the requisite showing, the burden then shifts to the State to come forward with a racially neutral explanation for its challenges of those prospective jurors of defendant's race. The trial court then must decide whether the State is engaged in purposeful discrimination. 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1722-24.

Defendant further relies on *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, where the defendant, a male, challenged the Louisiana jury selection system. In *Taylor,* the Supreme Court held that the systematic exclusion of women from the jury panels violated both the sixth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VI, XIV). The *Taylor* court struck down the Louisiana jury selection system in which a woman would not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service. The effect of this system was that only a few women, grossly disproportionate to the 53% of women in the community, were ever called for jury service.

Defendant admits that *Batson* may not apply directly to gender-based discrimination, but argues that the test set out in *Batson* to challenge racial discrimination on equal protection grounds is the same test used in *Taylor* to challenge gender-based discrimination under the sixth amendment. As such, defendant contends that *Batson* applies by analogy.

The State first replies that because defendant did not raise any

issue concerning purposeful discrimination until he filed his motion for a new trial, such issue has been waived.

■■ We note that the State's argument that defendant's failure to raise this issue before the jury was empanelled is well-founded, as a defendant should not benefit on appeal from his own failure to act, whether intentional or inadvertent. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233, 239; *People v. Colley* (1988), 173 Ill. App. 3d 798, 804, 528 N.E.2d 223, 228.) However, errors allegedly denying defendant's constitutional rights may be considered by reviewing courts, even if not properly preserved for review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *Colley*, 173 Ill. App. 3d at 804-05, 528 N.E.2d at 228.) We find that the issue raised by defendant that his equal protection rights and his sixth amendment rights were violated by the State's exercise of peremptory challenges to exclude women from the jury outweighs any considerations of waiver in the instant case.

The State, assuming the argument had not been waived, submitted the additional arguments that (1) the *Batson* decision was not intended to apply to gender-based discrimination, and (2) the facts themselves do not lend themselves to the result that defendant was denied his sixth amendment and equal protection rights because of the State's use of peremptory challenges to strike women from the jury.

■■ We first note that there are jurisdictions that have held that *Batson* does not extend to gender-based discrimination. (See *United States v. Hamilton* (4th Cir. 1988), 850 F.2d 1038; *State v. Culver* (1989), 233 Neb. 228, 444 N.W.2d 662; *State v. Oliviera* (R.I. 1987), 534 A.2d 867.) Furthermore, we note that *Taylor* is distinguishable from the instant case because here there has been no claim that women have been systematically excluded from the venire. In fact, of the 80 jurors on the original panel, 46 were female. In the instant case, however, the record does not support defendant's contention that the State systematically excluded women through its use of peremptory challenges.

In the instant case, the jury of 12 was drawn from a panel of 80—of these 80, 46 were women and 34 were men. Thirty-one women were excused for cause by the court. The defense peremptorily challenged four women while the State peremptorily challenged nine women. Two women were actually empanelled on the jury. Nothing in these facts persuades us that the State set out on a course designed to systematically exclude women for the mere fact that they were women. We find that defendant was not denied his

equal protection rights by the State's use of peremptory challenges to exclude women from the jury.

We now address defendant's second issue, whether he was denied a fair trial because he was not allowed to present proposed evidence in his defense. Defendant contends that he was denied the right to present several pieces of key evidence that would have, according to defendant, (1) refuted the testimony of the victim's husband that he and his wife had a good marriage, (2) that the victim's husband had trafficked in and used drugs in the past, and (3) that another man, David (Whitey) Hampston, may have committed these crimes. The State responds that the trial court properly refused defendant's proposed evidence because these matters were clearly extraneous.

■ The test of admissibility of evidence is whether the evidence fairly tends to prove the particular evidence charged (*People v. Peter* (1973), 55 Ill. 2d 443, 459, 303 N.E.2d 398, 408), and whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable. (*People v. Rodgers* (1972), 53 Ill. 2d 207, 214-15, 290 N.E.2d 251, 255.) A trial court has the prerogative to reject offered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or its conjectural nature. (*People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304, 308.) Most importantly, the admission of evidence is within the sound discretion of the trial court, and its ruling will not be reversed absent a clear showing of abuse. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702; *Bosel v. Marriott Corp.* (1978), 65 Ill. App. 3d 649, 654, 382 N.E.2d 587, 591.

■ The trial court would not admit the testimony of Rita Rich and Wilma Hardiman. In an offer of proof made outside the presence of the jury, defense counsel stated that both witnesses would have testified that they were co-workers of Melinda Buchanan. Rita Rich would have testified that three years prior to trial, Melinda Buchanan and her husband, Ben Buchanan, had separated and that Ben had hit his wife. Wilma Hardiman would have corroborated the act of violence by Ben Buchanan. Hardiman and her daughter would have further testified that after Ben had moved to California, Melinda Buchanan told both that she was not moving to California with her husband. Finally, the trial court would not allow the testimony of Barbara Gray, who would have testified that she and Ben Buchanan had carried on an affair from 1981 to 1985. In a separate offer of proof, defense counsel related that Mary Schultz, a friend

of Melinda's, had last seen the victim and her husband Ben one or two months prior to Melinda's death. At that time the two argued profusely and Ben told Mary Schultz that he wanted a divorce from his wife.

Ben Buchanan's testimony was that he and his wife had a good relationship and had never been separated. Defendant contends that since the jury never heard evidence contrary to Ben Buchanan's, the jury was never free to speculate on Ben's motive for lying. Defendant contends he was prevented from presenting his theory of the case that someone other than he had the motive and the opportunity to commit these crimes. We find that it was not error to exclude this testimony.

First, much of the testimony hinged on marital discord some three years prior to Melinda Buchanan's death. Second, the marital dissatisfaction suggested did not establish that Ben Buchanan had a motive to kill his wife and two infant daughters, especially in light of evidence that Ben Buchanan was in California at the time of the fire and did not carry life insurance on his family. We cannot conclude that the trial court abused its discretion.

■ Defendant was only allowed to present evidence of drug use one week prior to Melinda's death and no evidence of drug trafficking by Ben Buchanan was allowed. A State's motion *in limine* to bar testimony that cocaine and marijuana had been found in Melinda's body after her death was granted. The trial court in granting the State's motions *in limine* concerning any involvement with drugs by Ben Buchanan stated that the harm from such evidence outweighed the need to test Ben Buchanan's credibility. Ben Buchanan's testimony at trial concerned only his relationships with the victims and his notification of their death. The trial court also found that the proposed evidence of drug trafficking was "too far-fetched." After a review of the record, we cannot say that the trial court abused its discretion in excluding testimony concerning drug use. Such testimony was clearly prejudicial as compared to its probative value. Furthermore, any testimony concerning drug trafficking was, as the court found, farfetched.

■ Finally, the trial court would not allow defendant to present evidence concerning David (Whitey) Hampston's possible involvement in the victims' death. The extent of this testimony was that Hampston drove either a blue and white Ford Bronco or Chevrolet Blazer and that a blue and white Ford Bronco had been seen in the area of the victims' home by the first person to notice the fire at the residence. This witness attempted to flag down the Bronco in

order to get assistance, but the automobile drove away. The witness could not identify the driver nor say how many passengers, if any, there were. The only other evidence relating to Hampston was presented by defense counsel in the form of an offer of proof that three days prior to the victims' death Hampston had been in a local bar inquiring into defendant's identity. The State's objection to this testimony was sustained as being vague, farfetched and hearsay. We agree.

The fire at the Buchanan residence was not discovered until at least 45 minutes to one hour after it was set, so the fact that a blue and white Ford Bronco was spotted in the area an hour later carries little weight. In addition, the testimony that Hampston was inquiring into defendant's identity is undoubtedly hearsay.

Defendant makes an additional argument that the evidence against him was entirely circumstantial and the State's case was weak. Therefore, to sustain these convictions, guilt had to be established so as to exclude all reasonable theories of innocence. We disagree.

That the evidence against defendant is weak is contrary to the record before us. For example, pubic hairs matching defendant's were found in Melinda Buchanan's underpants. Defendant gave no reasonable explanation for this finding. Defendant's testimony that he changed shirts in the bathroom and combed his hair do not explain the presence of pubic hairs similar to his standard. Defendant admitted being at the scene and his black jacket was found next to Melinda Buchanan's body. Moreover, potting soil matching the soil in a plant located in the Buchanan's master bedroom was found on defendant's torn T-shirt and bandanna which were retrieved from defendant's car 10 days after the morning in question.

As stated above, the admission of evidence is within the sound discretion of the trial judge, and we cannot say that such discretion was abused in the instant case. We find no error in denying defendant's proposed evidence.

The third issue we are asked to consider is whether defendant was denied a fair trial because the State's rebuttal witness was permitted to testify without defense counsel having an opportunity to interview the witness. Defendant does not dispute the fact that the State only learned of the rebuttal witness' testimony the night before she appeared in court, and defendant is not arguing that the State should have provided this witness' name during pretrial discovery. Instead, defendant argues that the trial court should have granted a short recess in order to give defense counsel an opportu-

nity to interview the rebuttal witness prior to allowing the State to continue questioning her. The State replies that the court properly permitted the testimony of this witness where the State only learned of her presence the preceding day and informed defense counsel of the nature and purpose of her testimony before she actually testified.

■ The State need not inform the defendant of a rebuttal witness nor the substance of that witness' testimony until the intent to call the rebuttal witness is formed. (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 932, 420 N.E.2d 773, 777.) The reason for this rule is obvious. A prosecutor cannot know if a witness will be called in rebuttal until the defense testimony is heard. 95 Ill. App. 3d at 932, 420 N.E.2d at 777.

■ The defense presented testimony during its case from Jackie Lee Beard. Beard testified that he had seen the victim's husband's twin brother in Robinson in the early morning hours of February 1, 1987. Defendant's theory of the case was that he had not committed the crimes and that the victim's husband or his twin brother had both the opportunity and motive to commit the crimes. After Beard's testimony, Ben Buchanan informed the prosecution that a colleague of his and his brother's at the mortuary where they were employed, Sharon McCale, would be able to testify that both twins were in California on the afternoon of January 31, and the morning of February 1, 1987. Sharon McCale was flown from California to testify to her seeing the Buchanan brothers on the dates in question.

Defendant does not claim that McCale's testimony should have been excluded, but merely that a recess should have been granted so that defense counsel would have the opportunity to interview McCale before she testified. An examination of the record finds, however, that defense counsel did not request a continuance to interview McCale. In a situation such as this, the failure to request a recess generally waives a claim of error based on surprise. (*People v. Galindo* (1981), 95 Ill. App. 3d 927, 420 N.E.2d 773, 778.) We conclude that under these circumstances, the trial court's ruling to allow McCale as a proper rebuttal witness was not an abuse of discretion. No prejudice to defendant's right to a fair trial has been shown, as defense counsel was apprised of the nature and purpose of McCale's testimony before she actually testified.

■ Defendant next contends that his conviction for aggravated arson must be vacated because it is based upon the same physical act as felony murder, that of setting fires in the Buchanan house.

(See *People v. Cox* (1972), 53 Ill. 2d 101, 291 N.E.2d 1.) Because the State concedes that defendant's conviction for aggravated arson is based upon the same physical act as felony murder, and should be vacated, we need not address this issue except to find that defendant's conviction for aggravated arson is vacated. Based on this finding, defendant's contention that the trial court erred in sentencing defendant to an extended term is moot and need not be addressed by this court.

The final issue left for this court to address is whether defendant was denied a fair trial because of certain statements made by the prosecuting attorney in closing argument. Defendant argues that during closing argument the State may not make comments solely to inflame the passions or to arouse the prejudice of the jury, accuse defense counsel of fabrication or trickery, or make comments not based upon the evidence. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) In the instant case, defendant contends that the prosecutor repeatedly referred to defendant as a liar without any basis in the evidence, continuously denigrated opposing counsel and defense evidence, and spoke about the victims in a way calculated to arouse the prejudice of the jury.

■■ It is true that during closing arguments a prosecutor may not make comments solely to rouse the prejudice of the jury, accuse defense counsel of fabrication or trickery, or make comments not based upon the evidence. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) However, after examining the comments complained of in context, we do not find that they justify a reversal. It appears that the remarks did not constitute a material factor in defendant's conviction and were of such a minor nature in context that prejudice to defendant was not their probable result. (*People v. Berry* (1960), 18 Ill. 2d 453, 458, 165 N.E.2d 257, 259.) In the instant case, the proof of guilt was more than sufficient to support the jury's verdict. We find that the remarks complained of were harmless.

For the foregoing reasons, this court affirms in part and vacates in part the order of the circuit court of Crawford County.

Affirmed in part and vacated in part.

HARRISON and WELCH, JJ., concur.