THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLIFFORD MITCHELL, Defendant-Appellant.

First District (2nd Division) No. 1—89—2232

Opinion filed May 12, 1992.

Randolph N. Stone, Public Defender, of Chicago (Stephanie Ellbogen, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and Barbara Jones, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

A jury convicted defendant of aggravated criminal sexual assault. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).) He was sentenced to 12 years in custody of the Department of Corrections. He appeals, raising as issues whether (1) *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (*Batson*), and the 1970 Illinois Constitution prohibit exclusion of jurors based solely on gender; (2) prosecutive allusion to his prior arrest required granting him a mistrial; (3) hearsay statements were properly admitted; and (4) prosecutive closing argument deprived him of a fair trial. We reverse and remand for a new trial for reasons which follow.

The State's evidence adduced at trial was as follows. L.M., defendant's nine-year-old niece, testified that she was at home in the family room alone with defendant. She reported that he touched her on the leg. She first denied that he touched her between her legs or having claimed that such an incident took place; however, after further questioning, L.M. admitted telling Dolton police detective Richard Janowiak a "different" version. When she spoke to Janowiak she was truthful. She claimed that her mother told her not to tell what really happened.

On cross-examination, L.M. testified that defendant never touched her between her legs. The assistant State's Attorney told her to say defendant touched her, and a Young Women's Christian Association staff member told her to tell the jury that defendant

touched her in "a bad place." On redirect examination, she testified that defendant put his finger in her vagina "a little," but on re-cross-examination, when asked whether it was true that defendant "never put his finger in your vagina" she responded, "Uh huh."

Detective Janowiak testified that he interviewed both L.M. and her mother. Out of the presence of others, L.M. told him that when she was in the family room, defendant came in and sat next to her on the couch, put his hand inside of her pants, and placed his finger inside her vagina.

On the same day, Detective Janowiak testified, he interviewed defendant. He was then already in custody, but not for the subject case. Upon objection, the court struck this answer, and the jury was instructed to disregard the answer. Defense counsel then moved for a mistrial, which was denied. Janowiak further related that, after waiving his *Miranda* rights, defendant first denied assaulting L.M., but a few minutes later told him that he was in the family room watching television when L.M. walked across the room, and her pants looked baggy. He called her over and, as he pulled her pants up, he inserted his finger in her vagina. The statement was reduced to writing, which defendant signed.

Cook County Assistant State's Attorney (ASA) Colleen Hyland testified that she interviewed L.M.'s mother. Over a defense objection, Hyland related that the mother told her L.M. admitted defendant grabbed her, placed his hand down her pants, and rubbed her back.

ASA Hyland further testified that L.M. told her she was in the living room when defendant grabbed her. L.M. said her pants were baggy and falling down. Defendant put his hands down her pants and put his finger "inside her." She told defendant to stop and he did. Defendant told her not to tell her mother or he would not buy her any more gifts.

The State rested. Thereafter, defense counsel moved for a directed verdict. Upon denial, the defense rested.

The jury found defendant guilty. His post-trial motion for a new trial was denied and he was sentenced as first noted.

# I

Defendant first argues that the State systematically excluded males from the jury in violation of his right to equal protection of the law, relying upon *Batson*, and the 1970 Illinois Constitution, article I, section 2. Although the United States Supreme Court in *Batson* prohibited the use of peremptory challenges for excluding

jurors on the basis of race, as a violation of the fourteenth amendment (*Batson*, 476 U.S. at 99, 90 L. Ed. 2d at 89, 106 S. Ct. at 1724), defendant urges that this prohibition should be extended to gender exclusion as well.

The State asserts *Batson* should not apply to gender and, even if it does, there is no showing of such discrimination in the present case. The State also maintains that article I, section 2, affords defendant no greater protection than does the United States Constitution.

Recognition that gender bias has a deleterious effect on impartial jury service is hardly unique. For example, in 1946, the United States Supreme Court held that in States where women were eligible for jury service, Federal courts were precluded from intentionally and systematically excluding them from Federal jury service, since the United States Judicial Code (28 U.S.C. §§3411 through 3415 (1988)) reflected a design to make the jury a cross-section of the community and truly representative; otherwise, "only half of the available population [would be] drawn upon for jury service." (*Ballard v. United States* (1946), 329 U.S. 187, 191-93, 91 L. Ed. 181, 184-85, 67 S. Ct. 261, 263-64 (*Ballard*).) The *Ballard* court went on to note, prophetically:

"The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—*and not [their] sex*. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, *if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel?* The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both \*\*\*." (Emphasis added.) *Ballard*, 329 U.S. at 193-94, 91 L. Ed. at 186, 67 S. Ct. at 264.

Gender classification was given heightened scrutiny for equal protection analyses in *Frontiero v. Richardson* (1973), 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (*Frontiero*). There, discrimination violative of the fifth amendment was found in differential treatment accorded servicewomen, in contrast to servicemen. Four justices agreed that "*classifications based upon sex, like classifications based upon race*, alienage, and national origin, *are inherently suspect and must therefore be subject to close judicial scrutiny.*"

(Emphasis added.) (411 U.S. at 682, 36 L. Ed. 2d at 589, 93 S. Ct. at 1768.) The four justices found further that our nation has had a long and unfortunate history of sex discrimination (411 U.S. at 684, 36 L. Ed. 2d at 590, 93 S. Ct. at 1769), and went on to observe (411 U.S. at 686, 36 L. Ed. 2d at 591-92, 93 S. Ct. at 1770):

> "Moreover, since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, *the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . . .'* Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175 (1972). And what differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that *the sex characteristic frequently bears no relation to ability to perform or contribute to society."* (Emphasis added.)

In a separate opinion, one justice concurred in the finding of unconstitutional invidious discrimination, and three others separately concurred but declined to expand the list of suspect classifications, particularly because the adoption of the equal rights amendment was then pending. 411 U.S. at 691-92, 36 L. Ed. 2d at 594-95, 93 S. Ct. at 1772-73.

Two years later, the Supreme Court announced that male defendants possessed a constitutional right to an impartial jury and held that Louisiana's constraints upon women serving on juries violated the sixth amendment of the United States Constitution in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692 (*Taylor*).

Invidious discrimination against males in a different, but important, context was given close attention where a gender classification violated the equal protection clause. Applying a "subject to scrutiny" analysis, the Court held that gender classifications must be related substantially to the achievement of important governmental objectives to be acceptable, in *Craig v. Boren* (1976), 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (*Craig*).

The United States Supreme Court has not directly addressed the issue of gender-based challenges to prospective jurors in a fourteenth amendment, *Batson* setting. Nevertheless, the *Batson* Court clearly expressed concern with protecting identifiable group members who were the historical objects of invidious discrimination and capable of differential treatment, citing *Castaneda v. Partida*

(1977), 430 U.S. 482, 494-95, 51 L. Ed. 2d 498, 510-11, 97 S. Ct. 1272, 1280 (*Castaneda*). (*Batson*, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1722.) Those who were "a recognizable, distinct class, singled out for different treatment under the laws" came within the definition of an "identifiable group" according to *Castaneda* (430 U.S. at 494, 51 L. Ed. 2d at 510, 97 S. Ct. at 1280), involving Mexican-American potential jurors. As seen from *Ballard, Frontiero, Taylor, Craig,* and *Castaneda,* gender by group has been an historical object of invidious discrimination and readily falls within the ambit of *Batson* concerns. Therefore, as one commentator noted, "no negative inference should be drawn from the Court's failure to consider other groups in *Batson* because only racial discrimination was involved in that case." Morehead, *Exploring the Frontiers of Batson v. Kentucky: Should the Safeguards of Equal Protection Extend to Gender?,* 14 Am. J. Trial Advoc. 289, 303 (1990).

In *Holland v. Illinois* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803, the Supreme Court emphasized that although the sixth amendment requires a representative venire in order to meet the amendment's requirement of "an impartial" jury, " 'drawn *from* a fair cross section of the community,' " citing *Taylor* (419 U.S. at 527, 42 L. Ed. 2d at 696, 95 S. Ct. at 696), "it has never included the notion that, in the process of drawing the jury, *** initial representativeness cannot be diminished by allowing both the accused and the State to eliminate persons thought to be inclined against their interests—which is precisely how the traditional peremptory-challenge system operates." (Emphasis in original.) *Holland,* 493 U.S. at 480, 107 L. Ed. 2d at 916, 110 S. Ct. at 807.

Nevertheless, in *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (*Powers*), the Supreme Court observed that although an individual juror did not possess the right to serve in any particular case, a juror did have a fourteenth amendment right not to be excluded from a petit jury on account of his or her membership in a recognizable group. There the court extended *Batson* principles to a Caucasian defendant claiming the unconstitutional exclusion of black venirepersons, and observed that such discrimination in the selection of jurors casts doubt upon judicial process integrity. (*Powers,* 499 U.S. at 409, 113 L. Ed. 2d at 424, 111 S. Ct. at 1371.) The *Powers* Court found that "[t]o bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the

duty, honor, and privilege of jury service." *Powers*, 499 U.S. at 415, 113 L. Ed. 2d at 428, 111 S. Ct. at 1373.

Thereafter, the *Batson* rationale was extended to the exclusion of Latino and Hispanic jurors by reason of their ethnic heritage in *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (*Hernandez*). In *Hernandez*, the Court accepted the parties' categorization of excluded jurors as "Latino" or "Hispanic" and held that where members of such identifiable groups were excluded for reasons of ethnicity, the use of peremptory strikes would violate the fourteenth amendment equal protection clause as interpreted in *Batson*. *Hernandez*, 500 U.S. at 355, 114 L. Ed. 2d at 402, 111 S. Ct. at 1864.

Even more recently, the Supreme Court extended *Batson* to yet another application. In *Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077 (*Edmonson*), the Court held that prospective jurors may not be peremptorily challenged because of their race or ancestry in a private civil case, under the fifth (due process) and fourteenth amendments.

Of those jurisdictions which have considered whether *Batson* principles should be extended to gender discrimination cases, the findings have gone both ways. Recognizing a *Batson* extension to gender exclusion are: *United States v. DeGross* (9th Cir. 1990), 913 F.2d 1417, 1423 (*DeGross*) (gender-based discrimination against male jurors through the use of peremptory challenges is contrary to *Batson*), *modified on other grounds en banc* (9th Cir. April 2, 1992), No. 87–5226; *Di Donato v. Santini* (1991), 232 Cal. App. 3d 721, 283 Cal. Rptr. 751 (*Di Donato*) (*Batson* applies to gender discrimination); *State v. Gonzales* (Ct. App. 1991), 111 N.M. 590, 808 P.2d 40 (*Gonzales*) (*Batson* applies to gender discrimination); *People v. Blunt* (1990), 162 A.D.2d 86, 561 N.Y.S.2d 90 (*Blunt*) (*Batson* applies to gender discrimination); *State v. Levinson* (1990), 71 Haw. 492, 795 P.2d 845 (*Levinson*) (gender bias falls within ambit of State constitution and *Batson*). Contra: *United States v. Hamilton* (4th Cir. 1988), 850 F.2d 1038, 1042-43 (exclusion of women because they were female, rather than because they were black, avoided *Batson*); *State v. Adams* (La. App. 1988), 533 So. 2d 1060, 1063 (declining to extend *Batson* beyond purposeful racial discrimination); *State v. Clay* (Mo. App. 1989), 779 S.W.2d 673, 676 (*Batson* not extended to peremptory challenges of women); *State v. Culver* (1989), 233 Neb. 228, 233, 444 N.W.2d 662, 666 (refusing to extend *Batson* to gender-based discrimination). To the same effect are *Stariks v. State* (Ala. Crim. App. 1990), 572 So. 2d 1301, 1302-03; *Hannan v.*

*Commonwealth* (Ky. App. 1989), 774 S.W.2d 462, 463-65; and *State v. Oliviera* (R.I. 1987), 534 A.2d 867, 869-70.[1]

In those State cases which have applied the *Batson* rationale to gender-based peremptory challenges, State constitutions also have played important roles. (*Di Donato*, 232 Cal. App. 3d at 731, 283 Cal. Rptr. at 756; *Gonzales*, 111 N.M. at 598, 808 P.2d at 48; *Levinson*, 71 Haw. at 498-99, 795 P.2d at 849; and *Blunt*, 162 A.D.2d at 88, 561 N.Y.S.2d at 92.) In *Di Donato*, the court observed that under the fourteenth amendment to the United States Constitution and article I, sections 7 and 16, of the California Constitution (Cal. Const., art. I, §§7, 16), a party to a civil lawsuit may not use peremptory challenges to exclude women on the basis of their gender. The holding was founded upon the rule that a party may not exclude potential jurors because of their membership in an identifiable group (*Di Donato*, 232 Cal. App. 3d at 731, 283 Cal. Rptr. at 756). *Di Donato* relied upon *People v. Turner* (1986), 42 Cal. 3d 711, 715-16, 230 Cal. Rptr. 656, 658, 726 P.2d 102, 104, in which the California Supreme Court made clear that "the courts of this state cannot tolerate the abuse of peremptory challenges to strip from a jury, solely because of a presumed 'group bias,' all or most members of an identifiable group of citizens distinguished on racial, religious, ethnic, or similar grounds." The term "group bias" is defined as "a presumption that certain jurors are biased merely because they are members of an identifiable group distinguishable on racial, religious, ethnic, or similar grounds." *People v. Johnson* (1989), 47 Cal. 3d 1194, 1215, 255 Cal. Rptr. 569, 575, 767 P.2d 1047, 1053.

In *Gonzales*, the New Mexico court remanded the case for the purpose of ascertaining whether the fourteenth amendment under *Batson*, or article II, sections 14 and 18, of the New Mexico Constitution (N.M. Const., art. II, §§14, 18), were violated in peremptorily removing Hispanics and men from serving on the jury. *Gonzales*, 111 N.M. at 599, 808 P.2d at 42.

---

[1]See Morehead, *Exploring the Frontiers of Batson v. Kentucky: Should the Safeguards of Equal Protection Extend to Gender?*, 14 Am. J. Trial Advoc. 289 (1990); Puiszis, *Edmonson v. Leesville Concrete Co.: Will The Peremptory Challenge Survive Its Battle with the Equal Protection Clause?*, 25 J. Marshall L. Rev. 37, 51 (1991); Note, *Reconstruction of The Peremptory Challenge System: A Look At Gender-Based Peremptory Challenges*, 22 Pac. L.J. 1305 (1991). See also Note, *Sex Discrimination In The Voir Dire Process: The Rights of Prospective Female Jurors*, 58 S. Cal. L. Rev. 1225 (1985).

In *Blunt,* the New York court held that *Batson* applies to gender-based discrimination; the equal protection clause of the United States Constitution restricts government action based on gender; and gender-based distinctions are subject to New York constitutional and statutory scrutiny. (*Blunt,* 162 A.D.2d at 88-89, 561 N.Y.S.2d at 92-93.) The court found further that the male defendant there had standing to raise a claim under article I, section 11, of the New York Constitution (N.Y. Const., art. I, §11), concluding that consideration of gender-biased conduct extended to the selection of a petit jury. (*Blunt,* 162 A.D.2d at 88, 561 N.Y.S.2d at 92.) The court later held that the People failed to satisfy their burden of explanation in *People v. Blunt* (1991), 176 A.D.2d 741, 574 N.Y.S.2d 812. See also *People v. Irizarry* (1990), 165 A.D.2d 715, 560 N.Y.S.2d 279 (*Irizarry*) (in which the court adopted the *Craig* "subject to scrutiny" analysis[2]).

Although article I, section 2, of the 1970 Illinois Constitution contains due process and equal protection safeguards, section 18 contains another equal protection clause more applicable to this issue, which provides:

> "The equal protection of the laws shall not be denied or abridged on *account of sex* by the State or its units of local government and school districts." (Emphasis added.) (Ill. Const. 1970, art. I, §18 (section 18).)

In *Edmonson,* the United States Supreme Court asserted "that, without the overt, significant participation of the government, the peremptory challenge system, as well as the jury trial system of which it is a part, simply could not exist." (*Edmonson,* 500 U.S. at 622, 114 L. Ed. 2d at 674, 111 S. Ct. at 2084.) Accordingly, following *Edmonson,* "denial or abridgment" on account of sex in the exercise of peremptory challenges implicates State action under our equal protection provision contained in section 18. Similarly, the constitutions of the States of New Mexico and Hawaii each contain language explicitly prohibiting the denial or abridgment of rights on the basis of sex. (Haw. Const., art. I, §5; N.M. Const., art. II, §18.) By construction, the constitutions of New York and California also proscribe such denial or abridgment. N.Y. Const., art. I, §§1, 2, 11;

---

[2]In a pre-*Batson* decision, *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, the Massachusetts Supreme Judicial Court found part I, article XII, of the Massachusetts Constitution (Mass. Const., pt. I, art. XII), violated by the exercise of peremptory challenges on the basis of membership in discrete groups, including sex.

*Blunt*, 162 A.D.2d at 88, 561 N.Y.S.2d at 92; Cal. Const., art. I, §§7, 16; *Di Donato*, 232 Cal. App. 3d at 731, 283 Cal. Rptr. at 756.

The prohibition against illegal classifications based on sex received attention from our supreme court in *People v. Ellis* (1974), 57 Ill. 2d 127, 311 N.E.2d 98 (*Ellis*), in which the court considered the separate opinions in *Frontiero*, found the equivalent of the then proposed Equal Rights Amendment already articulated in the Illinois Constitution, and observed (57 Ill. 2d at 132-33):

"In contrast to the Federal Constitution, which, thus far, does not contain the Equal Rights Amendment, the [Illinois] Constitution of 1970 contains section 18 of article I, and in view of its explicit language, and the debates, we find inescapable the conclusion that *it was intended to supplement and expand the guaranties of the equal protection provision of the Bill of Rights and requires us to hold that a classification based on sex is a 'suspect classification' which, to be held valid, must withstand 'strict judicial scrutiny.'* " (Emphasis added.)[3]

■ From the foregoing it is clear that discrimination in the courtroom against any party or juror is constitutionally intolerable; defendant has the constitutional right to a jury which has been assembled without gender discrimination; competence to serve as a juror should depend on an assessment of individual qualities and his or her capacity to assess the trial evidence; and denial of jury service to a person based solely upon his or her sex is unconstitutionally discriminatory against the excluded juror by arbitrarily excluding him or her from the duty, honor and privilege of jury service. Accordingly, we hold that the principles of our constitutions, *Frontiero, Craig, Batson, Powers* and their antecedents and progeny, and *Ellis*, require us to consider the alleged gender bias as unconstitutional and impermissible in the present case. To do less would weaken and undermine confidence in our jury system and our pursuit of justice. (*Batson*, 476 U.S. at 87, 90 L. Ed. 2d at 81, 106 S. Ct. at 1718; *Powers*, 499 U.S. at 408, 113 L. Ed. 2d at 423, 111 S. Ct. at 1373.) We find no foundation in justice or in logic to differentiate between discriminatory uses of peremptory challenges based

---

[3]Extensive statutory provisions enacted by the Illinois General Assembly reflect pervasive public policy on this subject and the seriousness with which our legislature regards and has attempted to remedy gender bias in a multitude of diversified regulations. See appendix.

on racial or ethnic grounds, rather than on grounds of whether the prospective juror is a male or female.[4]

Defendant has the burden of demonstrating, *prima facie,* through direct or circumstantial evidence, the existence of purposeful discrimination. (*Batson,* 476 U.S. at 93, 90 L. Ed. 2d at 85, 106 S. Ct. at 1721.) The circuit court then must decide whether this showing is made, based upon the circumstances. (*Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) If so, the burden shifts, and the State must explain adequately the reasons for the exclusion, demonstrating that jurors were not excluded based upon the prohibited differentiation. (*Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; *Hernandez v. New York* (1991), 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1865-66.) The circuit court's determination with respect to this issue will be set aside only if the reviewing court is left with a definite and firm conviction that a mistake has been committed. (*Hernandez,* 500 U.S. at 367, 114 L. Ed. 2d at 410, 111 S. Ct. at 1871.) Such a determination is based upon credibility; therefore, the circuit court's ruling is given great deference. *Batson,* 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.

In the present case, the jury of 12 was drawn from a panel of 27 persons, of which 17 were female and 10 were male. After the State excused three males, the defense sought a sidebar conference. There, the defense asserted that the State was using its peremptory challenges systematically to exclude male jurors, stating, "Mr. Mitchell is charged with a crime[.] [H]e allegedly sexually assaulted a young girl. He's a male. And of the three challenges they used, each one they used is against *** males." The circuit court denied

---

[4]Recognizing the importance of an impartial jury trial, the State nevertheless claims that "[i]f the use of gender as a criterion for exercising peremptory challenges is prohibited, all such challenges will become inherently suspect, *** there would be little left of the peremptory challenge; [t]he floodgates to objectionable peremptory challenges would be open; not only would race and gender be suspect, but challenges would be exposed to cries of discrimination based on religion, ethnicity, national origin, age, sexual orientation and political affiliation, among others." These and other *in terroram* appeals have been considered and rejected by many authorities, chronicled in Puiszis, *Edmonson v. Leesville Concrete Co.: Will the Peremptory Challenge Survive Its Battle with the Equal Protection Clause?,* 25 J. Marshall L. Rev. 37 (1991). There, the author suggests that although recent decisions may complicate the heretofore unfettered peremptory challenge procedure, knowledge of applicable decisional law and an attentive eye and ear will mitigate any predicted collapse of the procedure by counsel's educated ability to support their otherwise acceptable challenges.

defendant's motion for a *Batson* hearing, remarking that "the suggestion this would constitute discrimination by the State in the exercise of peremptory [challenges] is too far fetched for me to be breaking new grounds on the issue." When the State exercised its fourth peremptory challenge by excusing another male, the defense again objected, arguing "[n]ow, it is obvious." After the State exercised its fifth peremptory challenge against a male, defense counsel contended, "I believe the pattern of male exclusion is more than evident at this time." The court ruled, however, that the matter had been resolved. In sum, the State utilized its first five peremptory challenges by excusing five males. Only one male ultimately served on the jury.

■ The pattern of strikes that evolved here raised a sufficient inference of exclusion based on gender, which merited a hearing. Whether applying a strict or heightened scrutiny analysis (*Frontiero*, 411 U.S. 677, 36 L. Ed. 2d 573, 93 S. Ct. 1764; *Craig*, 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451; *Ellis*, 57 Ill. 2d 127, 311 N.E.2d 98; *Irizarry*, 165 A.D.2d 715, 560 N.Y.S.2d 279), the refusal to grant a hearing under the circumstances presented *sub judice*, so as to allow the defense an opportunity to elucidate upon its complaint and to require the State to give neutral reasons for gender exclusion, was error.[5]

Since this case must be reversed and remanded for a new trial upon the bases set forth in part II of this opinion, the procedure to be followed upon retrial, should similar circumstances eventuate, is that outlined in *Batson* and in *People v. Hope* (1990), 137 Ill. 2d 430, 460-61, 560 N.E.2d 849 (*Hope*), a procedure again approved in *People v. Hope* (1992), 147 Ill. 2d 315, 318.

The State maintains that even if this court extends *Batson* principles to gender-based discrimination, defendant has failed to establish a *prima facie* case of discrimination. The hearing requested by defendant on this issue, however, was denied by the court. The State's conjectural explanations for excusing the potential male ju-

---

[5]These facts are distinguishable from *People v. Ashley* (1991), 207 Ill. App. 3d 984, 566 N.E.2d 745, in which the *Batson* rationale may have been recognized, but dismissed, where the court concluded that *defendant* was not denied his equal protection rights under differentiating circumstances. No mention was made regarding any arbitrary exclusion of citizens from the duty, honor and privilege of jury service identified in *Batson* (476 U.S. at 87, 90 L. Ed. 2d at 80, 106 S. Ct. at 1723) and in *Powers* (499 U.S. at 408, 113 L. Ed. 2d at 423, 111 S. Ct. at 1373). Our decision here is based, in part, upon the recognition of jurors' fourteenth amendment right not to be excluded from a petit jury based upon gender considerations.

rors are "too little and too late" to be accepted and themselves have the effect of an "undifferentiated review" (*Hope*, 137 Ill. 2d at 456), without a meaningful consideration of defense contentions and State explanations, of which this record was deprived by virtue of the court's refusal to hear them.

## II

Defendant maintains that the circuit court erred in allowing ASA Hyland to testify regarding out-of-court statements made by L.M. and her mother, for three reasons: (1) the court failed to comply with statutory requirements to provide evidence of the reliability of L.M.'s statements (Ill. Rev. Stat. 1987, ch. 38, par. 115—10(b)(1)); (2) the court failed to give limiting instructions; and (3) ASA Hyland's testimony regarding the mother's repetition of L.M.'s statements constituted inadmissible double hearsay, requiring a new trial. We agree.

## A

■ Defendant asserts no hearing was conducted, contrary to section 115—10(b)(1) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10(b)(1) (section 115—10(b)(1))), which requires that procedure to determine the reliability of testimony describing an out-of-court statement made by a child complaining of an act to another. (See *People v. Thompson* (1990), 198 Ill. App. 3d 417, 555 N.E.2d 1122.) The State maintains such a hearing was conducted outside the presence of the jury at which both counsel were present. Our examination of the record reveals that most of the hearing related to section 115—10.1 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1), however, involving prior inconsistent statements, not the reliability factor addressed by section 115—10(b)(1). Although ASA Hyland was mentioned briefly, she was mentioned vaguely. Instead, Detective Janowiak's testimony was the focal point of the hearing. There is no mention of Hyland's anticipated testimony, and no discussion as to the time, content, or circumstances of the statements made by L.M. to Hyland, as required by section 115—10(b)(1).

The State further asserts defendant failed to object to the sufficiency of the hearing and has, therefore, waived appeal of this issue. The record shows that defendant objected by stating "not an outcry witness." The State responded that this issue was previously decided. The court overruled the objection. This issue was again raised in defendant's post-trial motion. It is true that defendant did

not object to the *sufficiency* of a hearing, as the State asserts, but he did object to the fact that there was *no hearing* at all.

Although *People v. Roy* (1990), 201 Ill. App. 3d 166, 558 N.E.2d 1208, is cited by the State as authority for the proposition that the lack of such a hearing is not reversible error, the *Roy* decision was specifically applied to a bench trial, relaxing the rule when the judge is the trier of fact. The present situation involved a jury trial, not a bench trial. *Roy*, 201 Ill. App. 3d at 183.

Compounding the error here is the fact that L.M.'s testimony was ambiguous, inconsistent and contradictory. Credibility of the witnesses and reliability of their testimony was particularly important in this case. Failure to conduct a section 115—10(b)(1) hearing was error and is another basis for reversal and a new trial.

B

Defendant claims that the court erred in failing to instruct the jury as mandated by section 115—10(c). (Ill. Rev. Stat. 1987, ch. 38, par. 115—10(c) (section 115—10(c)).) Statements admitted under section 115—10(c) require that the jury be instructed to evaluate their weight and credibility by considering the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factors.

◼ The record reveals that no such instruction was given to the jury. The State asserts that defendant failed to object at trial to any alleged omission of instructions to the jury, relying upon *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124. Waiver of this objection results unless it is shown to be plain error. (*People v. Schmidt* (1988), 168 Ill. App. 3d 873, 878, 522 N.E.2d 1317, *appeal denied* (1988), 122 Ill. 2d 589 (*Schmidt*).) Plain error is that which deprives defendant of a fair and impartial trial or is any substantial error which occurs when the evidence is closely balanced. 134 Ill. 2d R. 615(a); *People v. Valko* (1990), 201 Ill. App. 3d 462, 559 N.E.2d 104 (*Valko*); *Schmidt*, 168 Ill. App. 3d at 878.

The State asserts that the circuit court here gave an instruction similar to section 115—10(c), and this was sufficient to advise the jury as to applicable law. The instructions as a whole must be examined to determine the cumulative effect of the error, which may reduce its impact. (*People v. Currie* (1980), 84 Ill. App. 3d 1056, 1064, 405 N.E.2d 1142.) The given instruction identified by the State does not specifically mention that the age and maturity of the witness and the nature of the statement should be considered, unrelated to the prescription of section 115—10(c).

Given the ambiguous, inconsistent and contradictory testimony of L.M., failure to instruct the jury with respect to the hearsay statements made by her to others deprived defendant of a fair trial. This was plain error and also requires reversal and remandment for a new trial.

C

Defendant asserts that ASA Hyland's testimony describing the mother's out-of-court statements to her regarding L.M.'s remarks constituted double hearsay and were inadmissible under section 115—10. ASA Hyland testified that L.M.'s mother informed Hyland that L.M. told her defendant grabbed her, placed his hands down her pants, and rubbed her back.

Initially, the State responds that defendant did not object at trial to the alleged double hearsay and, therefore, waived the issue. To the contrary, the record reveals that defense counsel did object to hearsay and was overruled. The issue was not raised in defendant's post-trial motion, however. This issue is waived, therefore, absent a showing of plain error. 134 Ill. 2d R. 615(a); *Valko*, 201 Ill. App. 3d at 469; *Schmidt*, 168 Ill. App. 3d at 878.

Defendant contends section 115—10(a)(2) applies to statements made by a child to the witness who directly heard the child's words, not to testimony by a third party who is stating what someone else said the child uttered.

The State insists, aside from contending defendant's argument was vague and should not be considered, that section 115—10(a)(2) allows testimony of an out-of-court statement made by a child and, therefore, allows ASA Hyland's testimony, because Hyland's testimony is *about* the child's out-of-court statement. The language of the statute reads "testimony *of* an out of court statement," not *about* an out-of-court statement. (Ill. Rev. Stat. 1989, ch. 38, par. 115—10(a)(2).) This clearly mandates that the testifying witness hear the child's remark personally, not just having heard about the remark from yet another person. ASA Hyland here testified as to what the mother said, not what L.M. said. In view of the ambiguity of L.M.'s testimony, this was plain error and should not be repeated upon retrial of the case.

Other assignments of error need not be considered in view of our disposition of this appeal. We trust that any excesses in advocacy which may have emerged will not be repeated upon retrial of this case.

For the reasons set forth above, the cause is reversed and remanded for a new trial.

Reversed and remanded.

DiVITO and McCORMICK, JJ., concur.

## APPENDIX

Statutes prohibiting gender discrimination in Illinois:

"An Act to create a division in the office of the Attorney General for the investigation and enforcement of laws relating to civil and equal rights, and to make an appropriation therefor." Section 1. Ill. Rev. Stat. 1987, ch. 14, par. 9.

The Illinois Public Aid Code. Section 11—1. Ill. Rev. Stat. 1987, ch. 23, par. 11—1.

"An Act to prohibit discrimination and intimidation on account of race, creed, color, sex, religion, physical or mental handicap unrelated to ability, or national origin in employment under contracts for public buildings or public works." Sections 4, 8. Ill. Rev. Stat. 1989, ch. 29, pars. 20, 24.

"An Act concerning discrimination on account of race, color, creed, sex, religion, physical or mental handicap unrelated to ability or national origin in the training and employment of persons, firms or corporations engaged in the performance of war defense contracts of the State or Federal Government and providing penalties therefor." Sections 1, 3, 7. Ill. Rev. Stat. 1989, ch. 29, pars. 24a, 24c, 24g.

The Illinois Blacklist Trade Law. Sections 3, 4, 5. Ill. Rev. Stat. 1989, ch. 29, pars. 93, 94, 95.

The Counties Code. Section 3—12007(b)(8). Ill. Rev. Stat. 1989, ch. 34, par. 3—12007.

The Illinois Antitrust Act. Section 3(5). Ill. Rev. Stat. 1989, ch. 38, par. 60—3.

"An Act to prohibit the solicitation or inducement of sale or purchase of real estate on the basis of race, color, religion, national origin, ancestry, creed, handicap or sex." Section 1. Ill. Rev. Stat. 1989, ch. 38, par. 70—51.

"An Act to abolish discrimination in the payment of wages between persons performing equal work, and to provide a penalty for the violation thereof." Section 1. Ill. Rev. Stat. 1989, ch. 48, par. 4a.

The Minimum Wage Law. Section 4(b). Ill. Rev. Stat. 1989, ch. 48, par. 1004.

The Neighborhood Redevelopment Corporation Law. Sections 3—4, 17. Ill. Rev. Stat. 1989, ch. 67½, pars. 253—4, 267.

The Illinois Housing Development Act. Section 13. Ill. Rev. Stat. 1989, ch. 67½, par. 313.

The Illinois Enterprise Zone Act. Section 9.2(a)(v). Ill. Rev. Stat. 1989, ch. 67½, par. 615.

The Illinois Human Rights Act. Sections 1—102, 2—101, 2—102, 2—105, 3—106, 5—103, 6—101, 7—106, 7—108. Ill. Rev. Stat. 1989, ch. 68, pars. 1—102(A), 2—101, 2—102, 2—105, 3—106(F), 5—103(C), 6—101(A), 7—106, 7—108.

"An Act in relation to certain organizations which discriminate." Sections 1, 2, 3, 4. Ill. Rev. Stat. 1989, ch. 68, pars. 101, 102, 103, 104.

The Developmental Disabilities Services Law. Section 1—4(3). Ill. Rev. Stat. 1989, ch. 91½, par. 1801—4(3).

"An Act in relation to the acquisition, control, maintenance, improvement and protection of State parks." Section 4a. Ill. Rev. Stat. 1989, ch. 105, par. 468.1.

The Health Services Education Grants Act. Section 2. Ill. Rev. Stat. 1989, ch. 111½, par. 822.

The Metropolitan Transit Authority Act. Section 28. Ill. Rev. Stat. 1989, ch. 111⅔, par. 328.

The School Code. Sections 10—20.7, 10—21.1, 10—22.5, 13—43.12, 22—19, 24—7, 27—1, 34—2.3, 34—2.5(e)(3). Ill. Rev. Stat. 1989, ch. 122, pars. 10—20.7, 10—21.1, 10—22.5, 13—43.12, 22—19, 24—7, 27—1, 34—2.3, 34—2.5.

The Public Community College Act. Sections 3—26(a), 3—42. Ill. Rev. Stat. 1989, ch. 122, pars. 103—26, 103—42.

"An Act in relation to educational reform and the financing thereof, amending Acts therein named." Article III, section 4. Ill. Rev. Stat. 1989, ch. 122, par. 1503—4.

The Illinois Summer School for the Arts Act. Section 5(2). Ill. Rev. Stat. 1989, ch. 122, par. 1755.

The Minority and Female Business Enterprise Act. Section 8b. Ill. Rev. Stat. 1989, ch. 127, par. 132.608.