THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH SEAWRIGHT, Defendant-Appellant.

First District (6th Division)   No. 1—90—0935

Opinion filed May 15, 1992.

James R. Kavanaugh, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Keith Seawright, of the murder of his wife, Estralita; he was sentenced to 30 years' imprisonment followed by a three-year period of mandatory supervised release.

Around 8 a.m. on June 23, 1986, the police were called by the defendant to his home at 262 Arcadia in Park Forest. The police found the defendant's wife, Estralita, in bed; she had been shot twice in the face. She was revived by paramedics but died on the way to the hospital. The defendant subsequently told the police that he conspired with a co-worker, Tim Reynolds, to kill his wife and that Reynolds did the killing. After the police investigated and exonerated Reynolds, the defendant confessed that he had shot his wife. He now maintains that his confession was the result of an illegal arrest and detention; that

he was not proved guilty beyond a reasonable doubt; and that other errors deprived him of a fair trial.

The defendant filed a pretrial motion to quash arrest and suppress evidence, claiming that he was arrested without probable cause. He also filed a motion to suppress his statements, arguing that they were not made voluntarily, and a motion to suppress evidence acquired when his home was searched. When the hearing on the defendant's pretrial motions commenced, Judge Richard Samuels presided over the case.

The defendant's attorney told Judge Samuels that the motion to quash arrest and the motion to suppress statements were separate motions; however, he believed that the evidence on the two motions would overlap. Therefore, he explained that the evidence presented on the motion to quash arrest would be adopted as evidence on the motion to suppress statements.

After a hearing, Judge Samuels denied the motion to quash arrest; he found that the defendant had been arrested between 2 and 2:30 p.m. on June 23 and that the police had probable cause to arrest him at that time. The motion to suppress statements was continued to a later date.

On the next court date, the defendant's attorney filed a motion to reconsider the motion to quash arrest. He explained that evidence that would be introduced on the motion to suppress statements should also be considered on the motion to quash arrest. Judge Samuels did not say whether he would reconsider his ruling on the motion to quash arrest but continued the case to a later date.

Judge Samuels retired and was replaced by Judge Paul Foxgrover. At the next court date, the defendant told Judge Foxgrover that the case was up on a motion to reconsider the motion to quash arrest. He explained that new evidence would be introduced during the motion to suppress statements which should also be considered on the motion to quash arrest. Judge Foxgrover noted that Judge Samuels had made findings of fact when he denied the motion to quash; he expressed reservations about reconsidering findings of fact. At the defendant's request, however, he agreed to defer his ruling on the motion to reconsider until after the hearing on the motion to suppress statements.

After hearing testimony and arguments on the motion to reconsider, the motion to suppress the defendant's statements and the motion to suppress evidence obtained during the search of his home, Judge Foxgrover denied all three motions.

This is a confusing record, as Judge Foxgrover noted. The parties agreed to hear the pretrial motions jointly. The statements of facts contained in the parties' briefs do not separate the testimony of the witnesses who testified at the motion to quash and suppress from their testimony at the trial. Our examination of the record discloses that the testimony of the witnesses at the pretrial hearings was substantially the same as their testimony at trial. In any event, we shall consider the evidence adduced at trial in addition to the evidence presented at the pretrial hearing in passing on the propriety of the trial judge's ruling on the motion to quash arrest and suppress evidence. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.) For the sake of brevity, our statement of facts will, except in certain specified instances, make no distinction between the pretrial testimony and the trial testimony.

Officer Fred Bailey of the Park Forest police department testified that he went to 262 Arcadia in Park Forest around 8 a.m. on June 23, 1986, in response to a call about a possible homicide. The defendant was at the front door; he told Bailey that his wife, Estralita, had been injured and was in the bedroom. Bailey and Sergeant Peck went into the bedroom and observed the victim and then went outside where the defendant was standing in the driveway. The defendant appeared unemotional.

The officers asked him what he had done before calling them. The defendant said that he had left for work around 10:30 p.m. the previous night and worked the 11 to 7 shift at a paper company in Alsip. He left work around 7:10 a.m. and arrived home approximately 20 or 25 minutes later. He parked in the driveway and used his key to enter the house through the back door. He saw several items of paper scattered about the kitchen and the living room, and all the lights in the house were on. He called to his wife but received no answer. He went into the bedroom and saw his wife lying on the bed. He tried to find her pulse and to wake her. He then went into the living room, where he found the phone unplugged; he plugged it into the wall and called the police. He ran next door to get his neighbor; he brought the neighbor back to his house, showed her his wife and told her that he had called for the police and an ambulance.

Detectives Kuester, Lancaster and Myers arrived at the scene around 8:15 a.m. Lancaster took photos of the scene. Kuester talked with Bailey in the driveway, and Bailey told him what had happened. Kuester and Bailey approached the defendant and had a brief conversation with him. Kuester identified himself and asked the defendant to tell him what had happened. The defendant told Kuester essentially

the same story he had related to Bailey. He said that when he found his wife, he pulled the blankets back and felt her body to see whether she was breathing. He went to the neighbor's house and knocked on her door; when she came to the door, he told her that his wife had been raped and beaten, and he told her to call the police. He did not explain why he found it necessary to call his neighbor.

Kuester told the defendant that he wanted Bailey to take a formal statement for his case report; he asked the defendant if he would accompany Bailey to the police station for an interview. The defendant said that he would. During this conversation, the paramedics brought the victim out of the house and took her away in an ambulance. Kuester testified that the defendant did not say that he wanted to go to the hospital with his wife. Bailey drove the defendant to the police station; the defendant was not handcuffed, and he sat in the front seat of the car. On the way to the police station the defendant said that he needed some cigarettes. Bailey stopped at a gas station where the defendant went inside alone and purchased cigarettes.

When they arrived at the police station, Bailey took the defendant into the detectives' office. Bailey worked on his notes and only spoke to the defendant to verify the information he had previously given. Periodically, the defendant would ask Bailey if he thought Estralita was dead, but he never asked if he could go to the hospital.

After the defendant and Bailey left, Kuester and Lancaster called for the evidence technicians and continued their investigation. The house was secured as a crime scene; officers were stationed at various locations to prevent access to the scene. The evidence technicians arrived around 9:30 a.m., and Kuester and Lancaster stayed and assisted them until about 11 a.m.

Kuester and Lancaster walked up the driveway and observed the exterior of the house and the backyard. They found a shell casing in the driveway and a cassette tape on the air conditioner in the backyard. They found some jalousie window slats on the ground outside the garage, and they also noticed broken glass on the ground outside the garage and through the window in the interior of the garage. There was a sizeable opening into the garage. The doors to the garage were locked.

Kuester and Lancaster decided to look around the house to try to determine any offender's point of entry. They entered the kitchen and observed that the rear kitchen window was completely open. The screen from the open window was in the backyard near the window; it appeared to have been pushed out from inside the house. Kuester noticed that the window on the storm door was loose from its frame.

The storm door and the wooden door behind it showed no signs of forcible entry. The windowsill underneath the open kitchen window was clean and free of any marks. The aluminum kitchen sink below the window was free of any scuff marks or shoe prints. The window edge and glass were uniformly dusty with no marks suggesting entry or exit through the window. There was dust on the window and around the frame of the window.

In the living room, Kuester and Lancaster saw various items, including department store bags and purses, scattered on the floor. The furniture, stereo equipment and television all appeared to be in their proper places. Books, papers, purses and other small objects were lying on the floor; some of these items were stacked on top of each other. There were no signs of forcible entry on the front door.

In the first-floor bedroom they saw a large water bed covered with blood. There was also blood on the floor near the bed. The blood was still in liquid form; some of it had started to coagulate. Kuester found two shell casings in the bedroom, one on the east side of the bed and one on the west side. There were cosmetics, jewelry, some clothing, a clock radio and a fan on top of the dresser. The drawers in the dresser were closed. There was jewelry hanging out of boxes in the bedroom, but it appeared undisturbed.

Kuester examined the two bedrooms on the second floor. One bedroom appeared to be an office. There were some items neatly stacked on the floor. The other bedroom contained a set of weights and a weight bench.

Kuester and Lancaster did not think that the house appeared to have been burglarized. They photographed the scene and then returned to the police station to request consent to search the vehicles in the driveway and in the garage. When they arrived at the station, the defendant was sitting in a chair in the detectives' office with Bailey and Myers; he was not handcuffed. Kuester showed the defendant two consent forms and asked him if he would give the officers permission to search the vehicle in his garage and the one parked in his driveway. The defendant said that he would give his permission, and he signed the forms, which also gave the officers permission to search the defendant's house. Kuester returned to the defendant's house and advised another officer on the scene that he had obtained the defendant's permission to search the two vehicles.

Robert Mazor, an evidence technician with the Cook County sheriff's police department, arrived at the scene around 9:30 a.m. Lancaster showed Mazor around the house. They did not begin to process

any evidence until Kuester returned with the signed consent forms around 10:30 a.m.

Mazor examined the upstairs office/bedroom and found a purse lying on the floor. A wallet containing money, credit cards, and a checkbook was on the desk. There was a cosmetics bag on the floor, and its contents appeared to have been poured out onto the floor next to it. In the kitchen, Mazor noted that the window over the sink was open and the screen was lying on the ground outside; the screen appeared to have been removed from inside the house. He noted that the automatic dialing portion of the alarm system had been disconnected from the phone line box. In the front room, he saw several items placed on top of each other; he thought this was unusual.

In the first-floor bedroom, he found two .38 caliber automatic shell casings; one was found on the east side of the bed and the other was found on the west side of the bed. He recovered four .38 caliber cartridges from a drawer in the nightstand on the west side of the bed.

Mazor found a shell casing on the driveway near the back door and two cassette tapes lying on top of the air conditioner behind the house. He examined the garage and noted that the slats from the garage window had been removed from the window and were lying on the ground outside the window. There were cobwebs around the window, suggesting to him that no one had entered the garage through that window. He also noticed that the garage of 260 Arcadia, the house just west of the defendant's house, also had a slat window from which the slats had been removed.

Inside the defendant's garage, Mazor noticed that the switch for the security light outside the garage was in the "off" position. The light was equipped with a light sensor, enabling it to turn on automatically at night and turn off automatically in the morning; however, the switch would have to be in the "on" position for the light to work. He examined the Lincoln Continental parked inside the garage and found that the cover on the steering column had been pried away and the turn signal lever had been broken off. He found both of these items in the garbage can in the garage. The ignition system on the car had not been bypassed; therefore, it could not have been taken without a key. The car's alarm system had been deactivated.

Mazor noticed several markings on the car's trunk lock. He removed the lock and submitted it to the crime laboratory for comparison testing, along with a screwdriver he found on the workbench. During his examination of the scene, he recovered approximately 25 latent fingerprint lifts, as well as several footwear impressions.

While Mazor was examining the house, Kuester used a key which he found in the house to open the garage. He found broken glass on a workbench underneath the jalousie window, but none of the tools or other items on the workbench appeared to have been disturbed. There were undisturbed cobwebs across the opening of the window. Kuester said that he did not think anyone could have gone through the window without disturbing the cobwebs.

After he finished examining the garage, Kuester interviewed several of the defendant's neighbors, including Marilyn Rice. On the motion to quash arrest, he testified that he asked Rice about the window that was loose on the storm door; she told him that the window had been loose from the frame for quite some time, perhaps more than a month. He asked her whether the security light was usually on, and she said that it was on a timer and turned on every night. She said that the light had not turned on the previous night, however, and she became alarmed when she noticed that it was not lighted. She also told Kuester that Estralita had said that she always turned on the alarm system when she went to bed.

While Kuester was interviewing witnesses, Lancaster returned to the station and found the defendant sitting in the detectives' office with Bailey. Around 11:30 a.m., he called the hospital and learned that Estralita had died. When the defendant was told that his wife had died, he sobbed and asked to make a phone call.

Kuester returned to the police station between 1 and 2 p.m. The defendant was sitting in the detectives' office drinking coffee. Kuester summoned Lancaster and told him that the module on the defendant's home alarm system which enabled the system to dial the police had been unplugged. Kuester also had learned that the security light over the garage turned on every night, but that it did not do so on the night of June 22. He said that the window on the storm door, which the defendant had said was newly damaged, had been loose from its frame for a long time. Kuester noted that there was a substantial gap between the time the defendant arrived home at approximately 7:35 a.m. and his call to the police at approximately 7:45 a.m.; Kuester did not think that the defendant's explanation of his actions during that time adequately accounted for the entire period.

Kuester and Lancaster spoke with the defendant around 2:30 p.m. Kuester told the defendant that he wanted to ask him some questions about his wife's death, and he gave the defendant a copy of a "Constitutional Rights of Persons in Custody" form. The defendant read and signed the form; he said that he understood his rights and that he would talk to them. Kuester and Lancaster felt that the defendant

was unemotional at the scene and at the station and that his answers sounded as if they were rehearsed. Also, his answers were inconsistent with the information received from Marilyn Rice, and his explanation of the reason that the alarm was disconnected did not make sense. From his examination of the house, Kuester did not believe that the house had been burglarized; valuable items remained in the house and there were no signs of forcible entry. Kuester and Lancaster said that after this conversation with the defendant they would not have permitted him to leave without instructions from the State's Attorney's office. Judge Samuels later found that it was at this point that the defendant had been placed under arrest. The defendant does not maintain that the police lacked probable cause to arrest him at that time.

Around 4 p.m. on that same day Kuester and Lancaster asked the defendant to submit to a polygraph examination. The defendant agreed, and Kuester and Lancaster drove him to the testing facility in Hillside. They stopped at McDonald's on the way to the facility and bought food for themselves and for the defendant. At the pretrial hearing but not at the trial, Officer Lancaster testified that the polygraph examiner told the officers that the defendant was being deceptive in certain answers. After the test was completed, the officers took the defendant back to the station. The defendant was nodding off in the car. They arrived back at the station around 7 p.m. and Kuester advised the defendant that he was under arrest. Because the defendant appeared tired, the officers decided not to question him; instead, they put him in a cell and let him rest until morning.

After the defendant was placed in the cell, Kuester came and asked him to sign a form allowing the police to take his shoes to determine whether they were used in the crime and a form allowing the officers to search his house again. The defendant signed the forms and gave the officers his shoes; he returned to his cell, where he remained until 8:30 the next morning.

After giving the defendant breakfast on the following morning of June 24, the officers brought him into the detectives' room and read him his rights which the defendant said he understood. Kuester told the defendant that there were some inconsistencies in his statement. The officers told him that they thought he was being deceptive, and they thought there was something more that he could tell them about what had happened to his wife. The defendant then told the officers that he had been at the home of Tim Reynolds, a co-worker, for a barbecue one month previously and had spoken with Reynolds about the defendant's debts and about Estralita's life insurance policy. He and

Reynolds concluded that the defendant's financial pressures would be relieved if Estralita were killed. The defendant and Reynolds then went to the defendant's house, and he showed Reynolds where his two handguns were located. Over a period of several weeks the defendant and Reynolds discussed the matter at work; finally, they agreed that Reynolds would kill Estralita while the defendant was away and make it look as if she was killed during a burglary. While the defendant was at work on the night of June 22, he signaled Reynolds to follow through with the plan. He rushed home from work the next morning to see whether the job had been done.

The detectives went over the defendant's statement with him a couple of times, trying to get the facts straight. Around 11:30 a.m., they returned the defendant to his cell and began gathering information about Reynolds. They contacted Reynolds' employer, FSC Paper Company, and learned that he was scheduled to work that afternoon. They contacted the State's Attorney's office and requested a conference with an assistant State's Attorney from the felony review unit. Lancaster, Kuester and Officer Fitzgerald went to the Alsip police department and then went to FSC Paper Company and took Reynolds into custody. With Reynolds' permission, they searched his locker at FSC. They also searched the defendant's locker pursuant to a consent form they had obtained earlier. They arrived back at the Park Forest police station between 3:30 and 4 p.m. and met Assistant State's Attorney Schweihs.

Schweihs received a call from either Fitzgerald or Kuester around 2 p.m.; he did not try to contact a court reporter after receiving the call. He arrived at the station around 3:30 or 4 p.m. and questioned the defendant in the detectives' room. The defendant had already signed a *Miranda* waiver form; he asked the defendant if he had signed the form and if he wanted to talk to him. The defendant did not request an attorney. Schweihs was aware that the defendant had been in custody since Monday. The defendant told Schweihs the same story about how he and Reynolds had planned to kill his wife.

After talking with the defendant, Schweihs questioned Reynolds for approximately 2½ hours. Reynolds said that the defendant and Estralita had attended a cookout at his house about one month previously and that he and the defendant had talked about the defendant's financial troubles. However, Reynolds said that they did not discuss Estralita's life insurance policy, nor did they discuss shooting Estralita. Reynolds admitted that he had gone with the defendant to his house and observed several weapons and then returned to Reynolds' home with some beer.

With Reynolds' consent, Kuester, Lancaster, Schweihs, Fitzgerald and a South Chicago Heights police officer searched Reynolds' home and interviewed his wife. Reynolds' wife indicated that he was home sleeping on the night of June 22 and that he did not wake up until 8:30 or 9 a.m. the following morning. The officers returned to the Park Forest police station and interviewed Reynolds again. Reynolds agreed to take a polygraph examination, and the officers arranged for the examination to take place the following morning at the Illinois State Crime Laboratory in Joliet.

After Reynolds was taken to the Matteson police department lockup facility around 12:30 or 1 a.m., Schweihs questioned the defendant again. Schweihs read the defendant his rights and he indicated that he understood them. The defendant agreed to make a written record of the statement he had made that afternoon. As the defendant repeated his statement, Fitzgerald typed what he was saying. The defendant read the typed statement, made corrections to it and signed it. The defendant was returned to the cell around 2 a.m. At the conclusion of the statement, Schweihs approved murder and solicitation to commit murder charges against the defendant. Schweihs testified that while the defendant was giving his statement, he did not appear tired, and he was not falling asleep.

Later that morning, Fitzgerald and Lancaster took Reynolds to the crime laboratory in Joliet for a polygraph examination. Kuester called the State's Attorney's office and spoke with Assistant State's Attorney Patricia Woulfe. Kuester explained to Woulfe that the detectives wanted to continue their investigation, and he asked for permission to hold the defendant another day at the station, rather than take him to court. Woulfe gave Kuester approval to continue holding the defendant.

Fitzgerald and Lancaster returned to the Park Forest police station around 11:30 or noon and discussed with Kuester the results of the polygraph test given to Reynolds. The detectives concluded that Reynolds was not involved in the murder and that the defendant had falsely implicated him.

Around 4 or 4:30 p.m. Fitzgerald and Lancaster brought the defendant into the detectives' room, read him his rights and began questioning him. The defendant admitted that Reynolds had not been involved in the shooting. The officers located Kuester and told him that the defendant had changed his story. Lancaster then released Reynolds from custody.

After advising the defendant of his rights again, Kuester and Fitzgerald asked him whether he had lied about Reynolds' involve-

ment in the murder. The defendant admitted that he had lied about Reynolds' involvement, and he said that he had personally shot his wife. The detectives talked with the defendant until about 6:25 p.m.; Fitzgerald took a photograph of the defendant eating dinner in the detectives' office around 6 p.m. At the end of the conversation they asked him if he would agree to provide a written statement, and he said that he would. As the defendant repeated his statement, Fitzgerald wrote what he was saying. He then went into another room and typed the statement; he returned and presented the typed copy to the defendant. The defendant read the statement, made some corrections and additions and signed it. In the statement the defendant said that he had shot Estralita twice so that he could collect the money from her life insurance policy. Estralita had incurred a lot of bills, and he needed the life insurance money to pay them. He admitted that he had scattered papers around, pushed the kitchen screen out, pulled the slats out of his garage window and his neighbor's garage window and damaged the car to make it look as if Estralita had been killed during a burglary.

Fitzgerald took another photograph of the defendant at 7:22 p.m. as he was making corrections on the written statement. The statement began at 6:36 p.m. and concluded at 7:24 p.m.; the defendant was then returned to his cell for the night. The next morning, June 26, the defendant was taken to the Markham courthouse for arraignment.

John Watley, Estralita's father, testified that she had been at his house on Sunday, June 22, around 7 p.m. They talked about a house that she was in the process of buying, and she asked him to lend her $8,000 to enable her to purchase the house. He agreed to give her the money. He gave her money now and then for things that she wanted, and he had purchased furniture for her house. When she was growing up, she had become accustomed to a good lifestyle.

Watley had paid the premiums on a $25,000 life insurance policy for Estralita until she married the defendant. Watley and his wife were the beneficiaries of the policy. After Estralita married the defendant, the insurance agent told Watley that the beneficiary on the policy had been changed.

On the morning of June 23, an unidentified person called Watley and told him that his daughter had a problem. He immediately went to her house, where he saw the defendant standing by himself in the yard. Just after he arrived, the paramedics brought Estralita out and put her in the ambulance. When the ambulance pulled away, he said to the defendant, "I'll see you at the hospital." The defendant said,

"Okay." He went to the police station twice that day and tried to see the defendant, but the officers told him that he could not see the defendant because he was under investigation.

Dr. Joanne Richmond, a pathologist, testified that she performed an autopsy on Estralita Seawright. Her external examination revealed a gunshot wound that entered the left eyebrow and exited just above and in front of the right ear, and another gunshot wound on the left side of the lip. There were embedded particles of gun powder around the entrance wound by the eyebrow, indicating that the gun was between six inches and three feet from the eye when it was fired. The exit wound by the right ear had tearing and abrasions, indicating that the head was supported, possibly by a pillow, when the bullet was fired. The cause of death was massive bleeding caused by multiple gunshot wounds.

Karen Vanderwerff, a forensic firearm and toolmark examiner with the Illinois State Police, examined three cartridge casings and four live cartridges recovered in this case. She determined that all three of the casings had been fired from the same gun. She also found that the three casings were of the same caliber as the cartridges, and that at least one of the cartridges had been chambered in the same .38 caliber automatic weapon from which bullets from the three casings had been fired.

Vanderwerff also examined the lock assembly taken from the trunk of the Lincoln Continental parked in the defendant's garage and a screwdriver which was also found in the garage. She determined that at least one of the marks present on the lock assembly had been made with the screwdriver.

Vanderwerff examined photos of the victim and noted that there was stippling around the wound above the left eye, indicating that the gun was between six inches and two feet away from the victim when it was fired. There was no stippling around the wound on the lip, indicating that the gun was three to five feet from the victim when it caused that wound.

Michael Wheeler and Paul Hodges, paramedics with the Park Forest police department, testified that they went by ambulance to 262 Arcadia at 8 a.m. on June 23, 1986, in response to a call regarding a battery victim. Wheeler checked the victim and found that her body was warm but she was not breathing and had no pulse. Her body was not stiff and there was no pooling or lividity. Wheeler asked Hodges to help him try to revive the victim.

Wheeler, Hodges and their lieutenant successfully revived the victim. The defendant, who was standing in the doorway, did not say

anything, but looked surprised. They took the victim to the hospital in the ambulance; they lost her pulse on the way. The hospital staff tried to revive the victim, but they were unsuccessful. She was pronounced dead around 9:10 a.m.

James Fazekas, a latent fingerprint examiner with the Illinois State Police Bureau of Forensic Sciences, testified that 16 of the 25 lifts obtained from the defendant's home were suitable for comparison. He conducted a comparison of the lifts and found that 12 of them were not the prints of the victim, and he could not give an opinion on whether four of them were made by her. He determined that none of the 16 prints was made by either the defendant or Reynolds.

The defendant testified that he and his wife, who worked as a cosmetologist, were preparing to move to a new house in Matteson, Illinois. When he left for work around 10 p.m. on June 22, 1986, his next-door neighbor and one of her daughters were at his house with Estralita, who was talking on the phone. He worked until his relief arrived around 7:20 a.m. the following morning. He punched out, but the time clock was not working; it had been broken all week. He changed his clothes and drove home, arriving there around 8 a.m.

He parked his car in the driveway, and as he approached the kitchen door, he noticed that the screen on the storm door was loose. He entered the house and saw that all the lights were on and there were papers and clothes strewn about the room. He thought this was unusual. He called his wife's name, but she did not respond. He went into the bedroom and saw a lump in the bed; Estralita looked as if she was sleeping in the bed with the covers over her head. He pulled the covers back and saw that her face was swollen and there was blood all over the bed. He began crying and screaming; he tried to wake her up; he could not feel her pulse. He ran to the front room to call the police and found that the phone was unplugged. He plugged the phone into the wall and called the operator; she connected him with the police. He told the dispatcher that his wife had been beaten and raped and asked her to send a squad car and an ambulance right away.

He ran next door and banged on Marilyn Rice's back door. She came to the window and asked what was wrong. He asked her whether she had heard anything the night before and to come to his house. She came to his house, and he showed her how he had found Estralita. She screamed and asked him whether he had called the police. He said that he had called them and they were on their way. He asked her to call his in-laws; she called Mr. Watley and told him that there had been an accident and asked him to come over immediately.

When the police and the paramedics arrived, he directed them to the bedroom. He watched as the paramedics worked on Estralita, and he kept asking them if she was going to be alright. Officer Bailey grabbed his arm and took him outside and questioned him. He was upset and crying and punched the fence a couple of times.

The officers questioned him until about 8:45 a.m. and then took him to the station. He told the officers that he wanted to go to the hospital with his wife, but they told him that he had to come to the police station for questioning. Officer Bailey grabbed him by the arm and put him in the squad car. The defendant said that his mother-in-law, Mrs. Watley, was standing nearby and heard him tell the police that he wanted to go to the hospital. Mr. and Mrs. Watley told him that they would meet him at the hospital, and he replied, "Okay, I'll see you there."

Although his car was operable, the police did not offer to let him follow them to the station. Instead, he rode in the squad car with Officer Bailey. He was not handcuffed, and he sat in the front seat of the car. On the way to the station, he asked Bailey if he had any cigarettes; Bailey stopped at a gas station and bought the defendant some cigarettes.

When the defendant arrived at the police station, an officer took him to an interview room and left him there alone. About 10 minutes later, Sergeant Kuester came in the room and questioned him for approximately 30 minutes. Kuester or Lancaster told the defendant that they had to search the premises and they needed his signature. He signed two forms allowing the officers to search his two vehicles. After he signed the forms, the officers asked him to empty his pockets; they took his keys, watch, wallet and belt. The officers locked the defendant in a cell and left. About an hour later the officers returned and took the defendant back to the same interview room for more questioning. At 1:30 p.m., he signed a form giving the officers permission to search his locker at work.

The police did not tell the defendant that Estralita was dead until just before they were going to take him for a polygraph test. He asked if he could make a phone call, and the officers said that he could. He called his mother at work and told her that Estralita was dead.

He did not remember stopping for food on the way to the polygraph test. The polygraph examination took two or three hours. After the test was completed, they returned to the Park Forest police station and the officers took his shoes, belt, watch, and wallet; he was

then returned to a cell. He could not remember at what point during the day they took his clothes.

The defendant testified on the pretrial motions, but not at the trial, that the officers brought him back to the detectives' room and told him that he had flunked the polygraph test and that they thought he was lying. They asked him to name people that he had invited to his house within the past few months.

The officers put him back into the cell, and although he was tired, he was unable to sleep. The steel bunk in the cell did not have a mattress or a blanket; there was a bright light shining directly into the cell; and the drunk person in the adjacent cell sang and screamed all night.

The next day the officers questioned him again. They told him that he was lying and said that he had "planned it." They had all of his bills, and they asked him how he could afford to pay them. They asked whether Estralita had a boyfriend. He told them that she had been married twice, and she was dating someone when they met. Her ex-boyfriend had come over to their house one night after they were married; he had a gun and was banging on the door and screaming.

The officers asked the defendant whether he kept weapons in the house. He told them where he kept his two guns, and they asked who else knew where the guns were kept. He said that Estralita knew where they were, and his father knew that he had the guns. They asked him to name all of the people that he let into his home, and he mentioned Tim Reynolds. They asked where Reynolds lived and worked, and he told them. One of the officers left the room for a while, and when he came back he asked several questions about Reynolds; the officer suggested that Reynolds was the killer. The defendant told the officers that he had shown Reynolds his guns, but that he could not believe that Reynolds had killed Estralita. This questioning went on for hours. The defendant was tired and upset, and he could hardly keep his eyes open.

The officers repeatedly put the defendant in the cell and brought him back out again, telling him that they did not think he was telling the truth. They told him that they had checked out Reynolds and determined that he was not involved. The defendant told the officers numerous times that he was tired and he wanted to stop the questioning, but they continued interrogating him.

Schweihs came in and introduced himself. Lancaster said, "Okay, Keith, tell the assistant State's Attorney what you told us." The defendant said, "What did I tell you?" Lancaster said, "You know, Reynolds did it." The defendant said that he had not told the officers

that Reynolds did it. Schweihs got up and left; he returned a few hours later. The defendant remembered someone typing; the officers shook him and woke him up a few times and told him to sign documents. He signed and initialed several documents. He signed the statement and initialed changes on it because the officers told him to. Some of the information on the statement came from him, but about 80 percent of it came from the police officers. The officers asked him to read the statement, but he refused.

At one point, the officers took the defendant out of the cell and drove him back to his house. He did not know what day it was. They went to the backyard and asked him where he had thrown the guns. He said that he had not thrown any guns anywhere.

The defendant signed a lot of things because the officers told him to. He did not know what he was signing. The officers led him to believe that they were going to let him go. They never told him that he was under arrest; they just kept telling him that they had a few things to clear up. He was unaware that people were trying to contact him at the police station. When he was shown his second typed statement at trial, he said that he did not remember signing the statement or writing, "I also suspect that she was seeing another guy named Jess" at the bottom of the page; however, he acknowledged that the sentence and his signature were in his handwriting.

During his testimony on cross-examination at trial, the defendant revealed his financial situation. Before he married Estralita, he had very few financial obligations. At the time of her death, he owed $16,000 on one car and $10,000 on another. He owed $16,000 on credit cards and had a bank loan in the amount of $19,490. Estralita had purchased a mink coat and charged it to their American Express card. They had sold the house on Arcadia for $47,000 and were in the process of purchasing a new house for $85,000. Estralita had purchased carpeting for the house on Arcadia in December of 1985, and she was in the process of buying rugs and drapes for their new house.

At the hearing on the motion to suppress the defendant's statements, Assistant State's Attorney Patricia Woulfe testified that she received a phone call from attorney James Kavanaugh around 5:15 p.m. on Wednesday, June 25, 1986. Kavanaugh told her that he was trying to contact the defendant but the police would not let him speak to the defendant. At Kavanaugh's request, Woulfe called the police station around 5:30 p.m. and spoke with Officer Lancaster. She requested that the officers refrain from questioning the defendant. She called the station again around 6:50 p.m. and asked for Detective Kuester, but she was unable to speak with him.

The defendant's mother, Dorothy Mae Seawright, testified both at the motion to suppress and at trial. She said that around 4:15 p.m. on Monday, June 23, 1986, she received a telephone call at work from the defendant. He told her that Estralita had been shot and raped, and said that he had just learned that she was dead. He said that he was at the Park Forest police station and that he was getting ready to take a polygraph test.

A few minutes later, she called back to the police station and was told that the defendant had left. She went home and then called the station again. The person who answered told her that the defendant was not back yet. When her husband arrived home, she told him what had happened and they both went to the Park Forest police station around 7:30 or 8 p.m. Detective Kuester told Mrs. Seawright that she could not see the defendant, and he suggested that she go home and relax. He told her that he would contact her when they had finished questioning the defendant.

On Tuesday, June 24, Mrs. Seawright called the station approximately three times, and each time she was told that she could not speak with the defendant because he was being questioned. She went to the station around 1 p.m.; an officer told her that she could not see the defendant because they were still questioning him; he said that they would contact her when they were finished. She returned to work; she called the police station again before she went home from work and was told that she still could not speak with the defendant. She called attorney James Kavanaugh's office and left a message for him.

She returned to the police station on Wednesday, June 25 and was once again told that she could not see the defendant. Kavanaugh returned her call that day, and she arranged for him to represent the defendant. The defendant never asked her to call a lawyer; he did not think he needed one. Mrs. Seawright finally saw the defendant on Thursday, June 26, in the courtroom.

Marilyn Rice testified at the hearing on the motion to quash arrest, the hearing on the motion to suppress statements, and the trial. Shannon Hollum, Rice's daughter, testified at the hearing on the motion to quash arrest and at the trial. Rice and her children had moved into the house next door to the Seawrights on June 6, 1986. Estralita came over to visit Rice the day she moved in, and they instantly became friends. On June 23 she went over to Estralita's house around 1 a.m.

Rice had noticed that the security light over the garage was lighted every night previously, but it was not lighted that night. When

Estralita answered the front door, Rice told her that the light was not on; Estralita said that she did not know what was wrong with it, but she was afraid to go out to try to turn it on.

Rice's daughters, Shannon Hollum and Shaundra, came over to Estralita's house shortly after Rice arrived. Rice went home around 1:30 a.m. and went to bed. She did not wake up or hear anything unusual that night.

Shannon Hollum testified that she waited outside the Seawrights' house that night and saw the defendant taking the garbage out. At that time, the security light was on. After the defendant left, she went inside the house. At that time, the security light was off. When she entered the house, her mother and her sister Shaundra were there. Shannon went home around 2 a.m.; she stayed up and watched television until about 2:45 a.m.; and then went to bed. She did not hear anything unusual that night.

The following morning, Rice heard the defendant banging on her door and screaming. He told her that Estralita had been raped and beaten and he asked her to come over to his house. He did not ask her to call the police or an ambulance. She went to the defendant's house and saw Estralita lying on the bed. She asked the defendant if he had called the police and the paramedics, and he said that he had. She went into the living room and saw cosmetics bags strewn about the floor.

At the hearing on the motion to suppress statements, Rice testified that Estralita had told her that she turned on the alarm system when she was home alone. She also testified that Estralita had received a couple of phone calls from an unidentified man three or four days prior to her death. She contradicted Kuester's testimony about the window on the storm door. Kuester had testified that Rice told him that the window had been loose for more than a month, but she testified that she had not told him that and that the window had not been loose prior to the day of the murder. She also testified that the defendant had his hands behind his back when the officers put him into the rear of the squad car, and she thought that he was handcuffed.

Larry Hutson testified that his backyard faced the backyards of the houses on Arcadia and that his yard was four houses away from the defendant's yard. Around 5 a.m. on June 23, 1986, he heard two explosions that sounded like gunshots; they were about 1½ seconds apart. He could not tell which direction the sounds came from; they could have come from the high crime area near his house. He said that he had heard a lot of firecrackers around the Fourth of July, but

these explosions did not sound like firecrackers. He did not call the police.

Robert Parks, John Packwood and Cleophus Dell all worked with the defendant and testified they saw him on the morning of June 23. Parks said he last saw him around 6:45 a.m.; Packwood testified he relieved the defendant around 7:15 that morning and talked with him for three or four minutes before Packwood started his shift. The defendant did not appear nervous or hurried. Dell testified he saw the defendant in the parking lot around 7:28 that morning and that the defendant did not appear unusual.

Officer Fitzgerald testified in rebuttal that when the defendant gave his first written statement between 11:30 p.m. on Tuesday, June 24 and 2 a.m. on Wednesday, June 25, the defendant never nodded off and the officers never had to wake him up to answer questions. He appeared alert and was always responsive to the questions he was asked. He never complained about not having enough sleep.

Officer Lancaster testified in rebuttal that the defendant was brought out of his cell approximately four times for questioning. During the entire period he was detained at the Park Forest police station, the defendant was brought out of his cell and questioned for a total of 9 or 10 hours. The only time he saw the defendant nod off was on the night of June 23, before 7 o'clock; the officers then put him in his cell so that he could rest for the night.

The parties stipulated that no gunshot residue was found on the pants and shirt that the defendant was wearing when the police arrived at his house, but that those items could have been in close proximity to a discharging firearm. They also stipulated that the driving time from FSC Paper Company to the defendant's residence was approximately 25 minutes when driving at the posted speed limit. Blood found underneath the victim's fingernails could have come from either the victim or the defendant, but did not originate from Timothy Reynolds. One Caucasian head hair was found on the victim's panties, which did not originate from the victim, the defendant, or Timothy Reynolds. The footwear impressions found at the scene did not match each other, and they did not match the shoes the defendant was wearing at the police station or another pair of men's gym shoes found in his house. The parties further stipulated that it was impossible to determine the age of a footwear impression.

The first question to be addressed is whether the defendant was illegally arrested. The defendant does not dispute the trial judge's finding that the police had probable cause to arrest him after 2 p.m. on June 23. Instead, he argues that Judge Samuels erred in finding

that the defendant was not under arrest when he left his home with the police around 8:30 that morning, before they had acquired probable cause.

In determining whether an individual was under arrest, a trier of fact must determine whether a reasonable person in the same circumstances, innocent of any crime, would have concluded that he was not free to leave. (*People v. Brown* (1990), 136 Ill. 2d 116, 125, 554 N.E.2d 216.) Because the test is objective rather than subjective, it is irrelevant whether the defendant believed he was under arrest or whether the police intended to detain the defendant against his will, unless that intent was conveyed to the defendant. (*People v. Bury* (1990), 199 Ill. App. 3d 207, 213, 556 N.E.2d 899; *People v. Holveck* (1988), 171 Ill. App. 3d 38, 47, 524 N.E.2d 1073.) A reviewing court may not reverse the trial judge's finding on a motion to quash unless that finding was manifestly erroneous. *People v. Booker* (1991), 209 Ill. App. 3d 384, 391, 568 N.E.2d 211.

The defendant's argument depends upon his own testimony that he wanted to go to the hospital with his wife but the police told him that he had to go to the station with them. The defendant testified that he told the officers numerous times that he wanted to go to the hospital; the police officers testified that the defendant never made any such request.

The defendant also relies on Marilyn Rice's testimony that she thought he was handcuffed and placed in the back seat of the squad car outside his house. However, the defendant testified that he sat in the front seat and was not handcuffed.

■ The record supports the judge's finding that the defendant was not under arrest when he summoned the police to his home and then agreed to accompany Officer Bailey to the police station to assist in the investigation of his wife's murder. The judge concluded that a reasonable man in the defendant's situation would have believed that he was free to go to the hospital or to the police station, and that this defendant voluntarily chose to go to the police station. Implicit in this finding is that the judge did not believe the defendant's testimony that he repeatedly expressed to the officers his desire to go to the hospital.

The cases cited by the defendant, *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296, and *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, are factually inapposite.

In *Dunaway*, it was conceded that the police would have restrained the defendant if he tried to leave the police station. In *Avery*,

the defendants were picked up at their homes and taken to a police station. The officers told the defendants they were investigating a shooting. The defendants were not told they were free to leave; each was left in an interrogation room and was told the officers would "get back to him [later]." (180 Ill. App. 3d at 153.) *The police reports stated that the defendants had been arrested at their homes.*

In *McGhee,* the police approached the defendant in his uncle's backyard the day after a killing and asked him to go with them to the police station. They drove the defendant to the station in an unmarked police car; on the way, they drove past the area where the victim's body had been found. The defendant was placed in an interview room at the station and left alone. He was later questioned four or five times over a 12-hour period and eventually he made an incriminating statement. The defendant was a juvenile, a fact the *McGhee* court emphasized.

The facts of this case are more similar to those of *People v. Woodson* (1991), 220 Ill. App. 3d 865, 581 N.E.2d 320. In *Woodson,* the defendant called the police after his wife and daughter were killed. When the police arrived, the defendant told an officer that someone named "Hollywood" had murdered his wife and daughter, and he gave the officer a license plate number and Hollywood's address. The victims were taken to the hospital; the defendant's wife was believed dead, but it was not known whether his daughter was dead. The defendant was also taken to a hospital because he complained of pain in his chest. After he was released from the hospital, the defendant accompanied the officers to the police station; he believed the officers wanted him to identify the assailants.

At the station, the defendant was placed in a small interview room. He was not photographed or fingerprinted, and he was not told he was under arrest. He was given food, coffee and cigarettes and was allowed to use the restroom. He was allowed to make a phone call to his parents. The police questioned the defendant, and he allowed them to examine and inventory his jacket. The following morning the defendant was questioned again; he repeated his earlier story over the course of five separate conversations with the detectives. Finally, 13 hours after his call to the police, he confessed to the murders. The police conceded that they did not have probable cause to arrest the defendant until after he made his confession. 220 Ill. App. 3d at 873.

The *Woodson* court acknowledged case law supporting the defendant's position that his arrest was illegal, but concluded the facts supported the trial judge's determination that a reasonable, innocent per-

son in the defendant's position would have felt free to leave the station. Because the trial judge's finding was not manifestly erroneous, his determination was upheld. 220 Ill. App. 3d at 876.

Like the defendant in *Woodson*, the defendant in this case initiated the contact with the police; he summoned them to his home and requested their help. The officers asked the defendant to accompany them to the police station because the scene at the defendant's house was too chaotic for them to effectively question him. On the way to the station, the defendant sat in the front seat next to Officer Bailey, and he was not handcuffed. (Compare *People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983 (defendant locked in back seat of police car).) At the defendant's request, Bailey stopped at a gas station; Bailey waited in the car while the defendant went inside, alone, and bought cigarettes. When they arrived at the police station, the defendant sat in a chair in the detectives' room and drank coffee. He was not placed in an interview room, and he was not searched, fingerprinted, booked, handcuffed or placed in a cell. The police officers testified that they would not have restrained the defendant if he had attempted to leave. (Compare *Dunaway*, 442 U.S. at 215 n.17, 60 L. Ed. 2d at 838 n.17, 99 S. Ct. at 2258 n.17, and *Vega*, 203 Ill. App. 3d at 42 (officers would have restrained defendant if he resisted or attempted to leave).) We conclude that Judge Samuels' finding that the defendant was not under arrest until after 2 p.m. on June 23 was not manifestly erroneous.

The defendant next contends that Judge Foxgrover erred when he denied the defendant's motion to reconsider Judge Samuels' ruling that the defendant was not arrested until 2 p.m. on June 23. In support of his motion to reconsider, the defendant argued that the testimony of John Watley and Marilyn Rice was new evidence warranting reconsideration of Judge Samuels' ruling.

Judge Foxgrover said that he would reconsider Judge Samuels' ruling on the motion to quash only if the defendant presented substantial new evidence that was not available when the motion was originally heard, relying on *People v. Holland* (1974), 56 Ill. 2d 318, 307 N.E.2d 380. Judge Foxgrover found that the defendant had failed to present substantial new evidence.

In *People v. Holland*, the supreme court held that a trial judge may consider a motion to suppress which was denied by another judge at a preliminary hearing; however, the failure of the trial judge to entertain the motion is not reversible error unless the defendant can show exceptional circumstances or additional evidence which was unavailable at the prior hearing. (56 Ill. 2d at 321-22.) We agree with

Judge Foxgrover's finding that the defendant failed to present any new evidence that was unavailable at the first hearing. The defendant does not allege that John Watley's testimony was unknown or unavailable at the first hearing; he simply argues that it is "new" evidence because it was not heard by Judge Samuels. Nor does he argue that Marilyn Rice's testimony was unknown or unavailable at the first hearing. Rice testified at the first hearing; the defendant simply failed to ask her about the storm window. The law is clear that a ruling on a pretrial motion should not be reconsidered merely because the defense has discovered a new argument. (*People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.) We conclude that Judge Foxgrover properly refused to reconsider Judge Samuels' denial of the defendant's motion to quash.

John Watley, the victim's father, testified that he told the defendant that he would see him at the hospital. Marilyn Rice contradicted Kuester's testimony that she had told him that the storm door window had been loose for some time. Rice's testimony had no relevance on the question of whether the defendant was under arrest at 8:45 a.m. on June 23 and the testimony of Watley was of minimal, if any, weight.

The defendant next contends that the trial judge erred in denying his motion to suppress his oral and written statements, because the defendant was subjected to lengthy interrogation, held in violation of *Gerstein v. Pugh* (1975), 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854, and section 109—1(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 109—1(a)), held incommunicado from his family, interrogated by officers who knew that he had been deprived of sleep, interrogated after telling the officers that he did not want to answer any more questions, and interrogated by officers who knew that attorney Kavanaugh had been retained for the defendant and had requested that they refrain from questioning him. He argues that these factors combined to make his statements involuntary.

The defendant cites no authority in support of his argument that attorney Kavanaugh's inability to speak with him rendered his statements involuntary. Indeed, the law is to the contrary. In *People v. Holland* (1987), 121 Ill. 2d 136, 520 N.E.2d 270, the Illinois Supreme Court adopted the reasoning of *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, and held that where a relative secured counsel for the suspect, the suspect was unaware that counsel had been retained for him, and all communication between the police or prosecutors and the attorney was by telephone, the police officers' refusal to inform the defendant that an attorney had been retained

for him did not invalidate his waiver of his *Miranda* rights. (121 Ill. 2d at 153.) Thus, *Burbine* and *Holland* govern the disposition of this issue. See also *People v. Mendoza* (1991), 208 Ill. App. 3d 183, 199-201, 567 N.E.2d 23.

The voluntariness of a defendant's statement is a question of fact to be determined by the trial judge, and his decision will not be reversed unless it is manifestly erroneous. (*People v. Hattery* (1989), 183 Ill. App. 3d 785, 821, 539 N.E.2d 368.) It is the province of the trial judge to resolve any conflicts in the evidence and to determine the credibility of witnesses. (*People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675.) The trial judge need be convinced only by a preponderance of the evidence that the statement was voluntary. *People v. McCleary* (1990), 208 Ill. App. 3d 466, 567 N.E.2d 434.

The defendant cites *County of Riverside v. McLaughlin* (1991), 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661, as support for his argument that his statements were rendered involuntary by his lengthy detention in violation of the guidelines set forth in *Gerstein v. Pugh*. In *Gerstein*, the court held that the fourth amendment requires a prompt judicial determination of probable cause as a prerequisite to any significant restraint of liberty. (420 U.S. at 124-26, 43 L. Ed. 2d at 71-72, 95 S. Ct. at 868-69.) In *County of Riverside*, the court held that a jurisdiction that provides judicial determination of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*. However,

> "[w]here an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a *bona fide* emergency or other extraordinary circumstance." 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

The defendant contends that the failure of the police to obtain a judicial determination of probable cause within 48 hours of his arrest renders his statements involuntary. As the State notes, however, a delay in bringing a defendant before a judge does not alone render a statement inadmissible; it is merely one factor to be considered in determining whether the statement was voluntary. See *People v. Smith* (1991), 222 Ill. App. 3d 473, 584 N.E.2d 211; *People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1090-91, 547 N.E.2d 523.

In accordance with *Gerstein*, the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 100—1 *et seq.*) provides that "[a] person arrested without a warrant shall be taken *without unnec-*

*essary delay* before the nearest and most accessible judge in that county." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 109—1(a).) In *People v. Smith* (1990), 203 Ill. App. 3d 545, 561 N.E.2d 252, the court held that the delay involved in taking a voluntary statement from a suspect is "necessary" within the meaning of section 109—1(a) under facts similar to those present here:

> "Once a defendant in lawful custody has knowingly waived his *Miranda* rights and indicated his willingness to talk to the police, as here, the police are under no obligation under section 109—1(a) of the Code to interrupt their interrogation as long as its length is not unreasonable and the suspect's statements continue to be voluntary." (203 Ill. App. 3d at 563.)

Thus, *Smith* indicates that if a defendant waives his rights and makes voluntary statements, section 109—1(a) is not violated if his statements cause his detention to be lengthy. However, *County of Riverside* would presumably put the burden on the State to show that extraordinary circumstances prevented the State from providing the defendant with a probable cause determination within 48 hours after his detention, that is, before 2 p.m. June 25. The issue, therefore, is whether the State established that any delay was reasonable. A subjacent issue is whether the defendant himself caused or substantially contributed to the delay.

A review of the record in this case shows that after being arrested at 2 or 2:30 p.m. on Monday, June 23, the defendant was given a polygraph examination. The polygraph examiner told the police that the defendant was not telling the truth. The officers thought the defendant appeared tired when they returned to the police station around 7 p.m., so he was placed in a cell to rest for the night. At some point, the officers took his clothes and his shoes for examination and gave him prison clothes to wear. The defendant testified that he was unable to sleep because the steel bunk did not have a mattress or a blanket, there was a bright light shining into his cell, and the person in the adjacent cell was loud. The defendant's lack of sleep is a factor to be considered by the trial judge in determining whether the defendant's statements were voluntary. (*People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316.) However, there was sufficient testimony from the police officers and the assistant State's Attorney for the trial judge to conclude that the defendant was awake and alert when he signed the statements.

On the morning of Tuesday, June 24, the defendant was given breakfast and then questioned again around 9 a.m. During this period of questioning, the defendant made an oral statement implicating him-

self and Reynolds. The officers contacted the Alsip police, went to Reynolds' place of employment, and took him into custody. Assistant State's Attorney Schweihs came to the police station and spoke to the defendant, who repeated his statement implicating Reynolds. In the meantime, other officers searched Reynolds' home and questioned his wife and arranged for him to take a polygraph examination the following morning. Schweihs spoke with the defendant again around midnight and asked him if he would agree to put his statement in writing. The defendant agreed to do so, and Fitzgerald typed his statement around 1:30 a.m.

The following morning, Wednesday, June 25, Kuester telephoned Assistant State's Attorney Woulfe and requested approval to detain the defendant an additional day for further investigation. Woulfe spoke with her supervisor and gave Kuester approval to hold the defendant until the next day. Meanwhile, the other officers took Reynolds to Joliet for a polygraph examination; they returned around 11:30 or 12 o'clock. Around 3:30 p.m., Lancaster spoke with the defendant and confronted him with Reynolds' alibi. The defendant then admitted that his previous statement was false, and that he had actually killed his wife by himself. Lancaster informed Kuester that the defendant had changed his story. A second statement was reduced to writing between 6:30 and 7 p.m., and the defendant was taken to court the following day and charged with armed violence and murder.

The defendant made his first incriminating statement approximately 19 hours after he was found to be under arrest. He received *Miranda* warnings regularly throughout his custody; the time spent questioning him was not unreasonable; he does not allege that he was denied food or water; and the police officers testified that he was awake and coherent when he signed the statements. He does not allege that he was unable to read the typed statements; he simply states that he chose not to read them. Nonetheless, he acknowledged signing the statements; a part of one statement is in his own handwriting. Most important, any delay beyond the 48-hour deadline was caused by the defendant's false implication of Reynolds. The police are to be commended rather than criticized for investigating the false allegations against Reynolds. Considering the totality of the circumstances, we conclude that the judge did not err in finding that the defendant's statements were voluntary and denying the motion to suppress them.

The defendant next contends that the police officers' warrantless search of the scene prior to their receipt of a signed consent form was unlawful. We do not believe that the defendant has preserved this

question for review. He filed several pretrial motions, including a motion to quash arrest, a motion to suppress statements on the ground that they were involuntary, a motion to suppress evidence as a result of an alleged illegal arrest and a motion to "suppress any evidence found as a result of inspection, discovery, testing or evaluation of his home, garage and grounds by the Park Forest police." The motion does not identify any property sought to be suppressed with any specificity. Nor does the defendant specify in his brief in this court the evidence which the police improperly acquired at the defendant's home and was introduced in evidence. Consequently, we are unable to determine whether the defendant is referring to evidence which was in plain view when the police arrived or evidence which was favorable to the defendant or evidence which was discovered when the police moved about the premises. A motion to suppress "must of course identify the items which the defendant seeks to suppress." 4 W. La-Fave, Search & Seizure §11.2(a), at 214 (2d ed. 1987), citing *O'Neal v. United States* (D.C. Cir. 1955), 222 F.2d 411.

■ Waiver aside, however, we find no error in the admission of any evidence discovered by the police in the search of the defendant's home. The defendant consented to a search of his premises and his automobiles at 10:30 a.m. The trial judge found, and we agree, that the consent was voluntarily given. Indeed, the defendant testified that he wanted his premises searched; he wanted the police to find the person who had committed the crime. We judge, therefore, that the evidence discovered by the police before 10:30 a.m. ultimately would have been discovered after the police were given consent to search. (See *Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501.) Finally, we observe that much of the evidence disclosed by the police search supported the defendant's defense that a burglar had committed the crime. The shoe prints and several fingerprints recovered were from persons other than the defendant, the deceased or Reynolds. We conclude, therefore, that the judge did not err in denying the motion to suppress evidence acquired by the police at the defendant's home. In view of our position we need not discuss whether the defendant had impliedly consented to the search of the premises when he called the police.

The defendant next maintains that the admission of his first statement, which implicated Reynolds, damaged his alibi defense because it misled the jurors to believe that he had killed his wife through an agent. He also maintains that the statement went beyond the State's bill of particulars which indicated that the State intended to prove that the defendant himself shot his wife.

■ There can be no doubt, and the defendant implicitly concedes, that the statement of the defendant implicating Reynolds constituted a confession to the crime under an accountability theory and was thus independently admissible. The defendant's argument seems to be that the statement was inadmissible because it was false. It is the rule that false exculpatory statements are admissible, the rationale being that false exculpatory statements reveal the defendant's consciousness of guilt. (See *People v. Wilson* (1972), 8 Ill. App. 3d 1075, 291 N.E.2d 270.) False exculpatory statements made by the defendant may be introduced in the State's case in chief. (*People v. Puente* (1981), 98 Ill. App. 3d 936, 424 N.E.2d 775.) In *People v. Simmons* (1950), 407 Ill. 417, 95 N.E.2d 477, the supreme court upheld admission of a statement by the defendant in which he "tried to concoct a scheme by which the authorities would be led to suspect that some innocent person had taken his car and caused the accident" which killed a pedestrian. (407 Ill. at 424.) If a false exculpatory statement attempting to shift blame is admissible, *a fortiori*, a statement in which the defendant admits only some guilt but falsely attempts to foist the principal guilt on an innocent person is admissible.

The defendant's argument that the statement should not have been admitted because it violated the State's bill of particulars is without merit. As the State notes, the bill of particulars merely confines the State to evidence supporting the particular charge, that is, that the defendant killed his wife; it does not require the State to specify all the evidence that will be offered in support of the charge. (*People v. Morrison* (1988), 178 Ill. App. 3d 76, 532 N.E.2d 1077.) We conclude, therefore, that the court did not err in admitting the statement implicating Reynolds.

The defendant next maintains that the court erred in barring evidence before the jury that his mother, his father-in-law and attorney James Kavanaugh had tried to contact him while he was being questioned at the police station and that an assistant State's Attorney called the station at Kavanaugh's request and asked the officers to refrain from questioning the defendant. The trial judge determined that the evidence was not relevant and did not allow the defendant to present it to the jury.

A trial judge's determination that a statement is voluntary does not preclude the defendant from challenging the statement before the jury at trial; thus, the defendant has the right to present evidence to the jury which affects the credibility or weight to be given the confession. *People v. Monroe* (1981), 95 Ill. App. 3d 807, 420 N.E.2d 544, citing *People v. Cook* (1965), 33 Ill. 2d 363, 211 N.E.2d 374.

■ We do not agree that the evidence the defendant sought to present affects the credibility or weight to be given to his statements. Although a defendant may challenge the credibility of a confession admitted at trial, he is not allowed to present evidence at trial relating only to the admissibility of his statements after the court has determined admissibility on a motion to suppress. (*People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140.) The State correctly asserts that only the wants and desires of a defendant, and not those of his family and friends, affect the credibility of his statements. The defendant was unaware that people were trying to contact him and that his attorney wanted the police to stop questioning him; therefore, the proffered evidence had no bearing on the credibility or weight to be given to his statements.

Moreover, the defendant was allowed to present evidence which did affect the credibility of his statements. He presented testimony before the jury that the police made him go to the station for questioning even though he told them that he wanted to go to the hospital to be with his wife. The jury was made aware of the extended length of his detention, the repeated interrogation sessions, the condition of his cell and his lack of sleep. The jury heard the defendant's testimony that he was so physically and mentally exhausted that he did not know what he was doing or saying when he spoke to the police. In addition, we fail to see how the barred testimony would have assisted the defendant. The defendant's mother testified that when she spoke to him on the afternoon of June 23 he told her that he did not think he needed a lawyer.

Kuester testified that between 3:30 and 7:30 p.m. on June 25 he instructed the dispatcher and various other personnel of the police department that he was conducting an interview and should not be disturbed. Some time after the defendant had given the second written statement, a dispatcher informed Kuester that an attorney had called for the defendant while Kuester had been speaking to the defendant.

Lancaster testified that he answered a call directed to one of the detectives at approximately 5 p.m. on June 25. The call was from an attorney asking about the defendant. Lancaster advised the attorney that he could see the defendant if he came to the station. The attorney indicated he could not come to the station because he had to teach a class. Lancaster took another call around 5:15 p.m. The call was from Assistant State's Attorney Patricia Woulfe who asked if the defendant was in custody. (This is the same assistant State's Attorney who had previously told the police that they had another 24 hours within which to question the defendant.) Woulfe told Lancaster that

she had spoken to an attorney claiming to represent the defendant, and the attorney requested that the police not speak to the defendant anymore. When Lancaster informed Woulfe that the defendant was being questioned at the time, she advised Lancaster not to interrupt the questioning but once the session was over, the police should not initiate any more questioning. Most significantly, all of this established that the first time any attorney made any attempt to contact the defendant, the defendant had already made an oral statement in which he admitted that he had previously lied to the police by implicating Reynolds and he had already confessed to firing the shots that killed his wife. We conclude, therefore, that the defendant was not prejudiced by the judge's ruling barring the testimony concerning the attempts of his attorney, his mother or his father-in-law to contact him while he was in custody.

██ The defendant next argues that the trial judge erroneously barred the defendant from introducing evidence that allegedly would support the inference that other persons had killed his wife. The defendant attempted to show that the police had received a complaint from a real estate agent that the deceased had called the agent on June 17, 18 or 19 to "report a suspicious car" in front of her home; in the car were two men and a woman. The driver of the car told the deceased that they were prospective buyers of her house (which was for sale) and that they were looking at the house. We find no error in the court's ruling denying the admission of that evidence. Although a defendant may prove any fact or circumstance tending to show that another person committed the crime for which he is charged, evidence may be excluded if it is irrelevant or speculative. (*People v. Ashley* (1991), 207 Ill. App. 3d 984, 566 N.E.2d 745.) In addition to the fact that the evidence constituted inadmissible hearsay, it was also irrelevant and speculative.

The defendant next assigns as error the judge's refusal to give the following instruction:

> "The prosecution neither alleges nor believes that the defendant committed this offense through an accomplice. Any evidence concerning such an allegation is admitted only as it affects the defendant's credibility."

It was the defendant's position that the admission of the statement implicating Reynolds damaged the defense and that this instruction was intended to cure the damage.

The following IPI instruction tendered by the State was given to the jury:

"You have before you evidence that the defendant made statements relating to the offense charged in the indictment. It is for you to determine whether the defendant made the statements, and, if so, what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (2d ed. 1981).

The defendant argues that two questions sent by the jury during their deliberations show that he was prejudiced by the introduction of the statement falsely implicating Reynolds and the failure to give his proposed curative instruction. While the jury was deliberating, it sent certain questions to the judge which he answered:

"JURY: Was there any testimony that the guns were ever found? If so, where were they found?

JUDGE: There was no testimony the guns were ever found.

JURY: What time did Timothy Reynolds go to bed on the evening of June 21 or early morning of June 22?

JUDGE: There was no direct or admitted evidence concerning your question about Timothy Reynolds. Remember the limited instructions given at the time of the testimony that any testimony was not given for the truth or falsity of the statement."

We do not agree that the judge made "conclusions based on his view of the evidence" when he answered the jury's second question. Rather, he told the jury that there was no evidence admitted which would answer its question. Moreover, the defendant cannot complain about the judge's reminder to the jury about the instruction given at the time the Reynolds statement was admitted; that instruction was in his favor.

An applicable IPI instruction should be given in preference to a non-IPI instruction unless the IPI instruction does not apply or does not accurately state the law. (*People v. Brooks* (1989), 185 Ill. App. 3d 935, 542 N.E.2d 64.) The determination of whether to give an IPI or a non-IPI instruction rests within the sound discretion of the trial judge. (*People v. Polk* (1986), 143 Ill. App. 3d 698, 493 N.E.2d 626.) Refusal to give a tendered non-IPI instruction is an abuse of discretion only when it results in the jury not being instructed on the defendant's theory of the case which is supported by some evidence. *Brooks*, 185 Ill. App. 3d at 942.

■ In the case before us, the IPI instruction given by the judge accurately stated the law and apprised the jury of how it was to as-

sess the weight to be given to the defendant's statements. In contrast, the defendant's proposed instruction incorrectly stated that the jury could consider his first statement only as to his credibility. The instruction did not inform the jury that it could infer consciousness of guilt from his first false statement; we have already pointed out that the first statement could be considered for that purpose. In addition, the tendered instruction did not pertain to his theory of the case; his defense was alibi; and the instruction had nothing to do with his alibi.

The defendant's last assignment of trial error is based on the testimony of Officer Lancaster that his investigation disclosed that the light over the garage was on every night except the night of June 22 and that a window on the storm door had been damaged for a period of time before June 23. His testimony was apparently based on information he received from another officer who had interviewed Marilyn Rice. The defendant maintains that Lancaster's testimony constituted inadmissible hearsay and was contrary to Rice's testimony at the pretrial motions that she did not tell the police the storm door window had been damaged before June 23.

■ Because Lancaster's testimony included the contents of the conversation the police had with Marilyn Rice, we have some doubt that Lancaster's testimony was admissible to explain police procedures. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.) On the other hand, evidence disclosing reasons for a defendant's arrest, which ordinarily might be inadmissible, may become admissible if the defendant seeks to convince the jury that he was unjustifiably singled out by the police. (*Cf. People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355 (testimony admissible to show why defendant was arrested when defendant's attorney suggested that the police had unjustifiably targeted the defendant eight months after the offense).) It may be fairly argued in the case before us that the defendant was maintaining that the police had unjustifiably targeted him. But we have determined that we need not decide if the evidence is proper because we have also concluded that, if any error occurred, it was harmless. Rice testified before the jury that the light was always lighted except on the night of June 22; this was the same thing that she had told the police officer. She also testified on cross-examination by the defendant's attorney that she never told the police that the storm door window had been damaged for a period of time before June 22. Therefore, the defendant was able to get before the jury testimony which cast an unfavorable light on the credibility of a police officer, whose testimony the defendant was anxious to discredit.

■■■ The defendant's last claim is that he was not proved guilty beyond a reasonable doubt. His attorney has properly pointed out the evidence or lack of evidence that militates in favor of the defendant's position: The failure to find either of the guns that the defendant said he threw away; a third unexplained shell casing in the driveway; fingerprints and footprints that did not match those of the defendant; and the finding of a Caucasian head hair on the undergarment of the deceased. (The deceased and the defendant are not Caucasian. The State theorizes that the Caucasian head hair could have come from any of the paramedics that worked to revive the deceased.) But the defendant's attorney also concedes, as he must, that the defendant's confession, if properly received, represents an overwhelming response to his argument that the evidence was insufficient.

The defendant's second confession is a detailed explanation of how and why he killed his wife. He told of his frustration over her spendthrift habits, of which the police had no previous knowledge; he suspected her of infidelity; and he contemplated divorce. He told of his attempts before going to work to do things he would not have time to do after shooting his wife: his damage to the car in the garage and the removal of the glass from his garage and from his neighbor's garage. His statement that he used a screwdriver to pry open the trunk of the car is particularly significant because crime laboratory tests taken later disclosed that the screwdriver had, in fact, been used on the trunk. The police could not have known of this fact at the time that the statement was made. Also significant is his statement that after punching out at work, he "drove home fast." He told of scattering papers and "other stuff" and of poking out the screen in the kitchen "to make it look like a burglary" had occurred. The State showed motive, opportunity, consciousness of guilt and a voluntary confession that was corroborated by other independent evidence. From all this, we judge, therefore, that the defendant was proved guilty beyond a reasonable doubt.

The crime was thoroughly investigated; the case was ably prosecuted; it was exhaustively and ably defended; and it was fairly tried. The jury has spoken, and there is no basis in the record for us to substitute our judgment for that of the jury.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and LaPORTA, JJ., concur.